# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

BEST AUTO REPAIR SHOP, INC.; <u>et al.</u>

    Plaintiffs,

      v.

UNIVERSAL INSURANCE GROUP, <u>et al.</u>,

    Defendants.

CIVIL NO. 11-2160 (PAD)

## OPINION AND ORDER

Delgado Hernández, District Judge.

    Elvis Martínez-Evangelista is the co-owner and President of Best Auto Repair Shop, Inc., a body shop located in Santurce, Puerto Rico.[1] He and Best Auto sued Universal Group, Inc.[2] and Universal's Claims Director, Juanita Ortiz-Core, seeking redress under 42 U.S.C. § 1981 and the Puerto Rico Civil Code. They attack defendants' decision to cease doing business with them in refusing to pay for repairs in Best Auto. In their view, defendants so decided because of Martínez' national origin and race.[3]

    Defendants denied liability and moved for summary judgment. At Docket No. 178, the court granted Universal's request in part, and denied Ortiz' request. <u>Id.</u> at p. 52. All parties have asked for reconsideration. Careful record review persuades the court that defendants' motion for

---

[1] Unless otherwise specified, Martínez and Best Auto will be jointly referred to as "plaintiffs."

[2] The complaint is directed against Universal Group, Inc.; Universal Insurance Company; Caribbean Alliance Insurance, Co.; and Eastern America Insurance Co. In June 2010, these companies merged into a single entity: Universal Insurance Company. <u>See</u>, Docket No. 162 at p. 3; Docket No. 71, Appendix 1, Defendants' "Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment" at ¶¶ 3-4. Accordingly, the Court will jointly refer to these entities as "Universal."

[3] Martínez is a national of the Dominican Republic and black.

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., *et al.*
Civil No. 11-2160
Opinion and Order
Page 2

summary judgment should be granted in its totality and the case dismissed. To facilitate review,

evaluation of the material examined has been structured as follows:

| | | |
|---|---|---|
| I. | PROCEDURAL DEVELOPMENTS…………………………..… | 3 |
| | A. | Initial Stages………………………………………..... | 3 |
| | B. | New Litigation ……………………………………… | 5 |
| | C. | Claims Awaiting Adjudication ……………………… | 6 |
| II. | SUMMARY OF ARGUMENTS……………………….………. | 6 |
| III. | STANDARD OF REVIEW……………………………….….... | 8 |
| IV. | UNCONTESTED FACTS……………………………………… | 9 |
| | A. | Best Auto's Business……………………………….. | 9 |
| | B. | Universal's Business……………………………….. | 10 |
| | C. | Universal's Claims Department's Structure…………………… | 10 |
| | D. | Loss-Liquidation Clause……………………………… | 11 |
| | E. | Claim Adjustment Process……………………………... | 12 |
| | F. | Conflicting Situations between the Parties……………………. | 14 |
| | G. | Complaints about Martínez' Conduct…………………………. | 15 |
| | H. | Plaintiffs' Disregard of Universal's Total-Loss Findings……… | 16 |
| | I. | Universal's Initial Response…………………………………. | 17 |
| | J. | Universal's Repair Network…………………………………. | 19 |
| | K. | Parts Discount Policy……………………………………….. | 20 |
| | L. | Efforts to Boycott Universal's Business Initiatives…………… | 20 |
| | M. | Universal's Reaction……………………………………….. | 22 |
| | N. | Effects of Decision………………………………………... | 25 |
| | O. | Other Body Shops………………………………………….. | 28 |
| | P. | Extreme Body Shop…………………………………………. | 30 |
| V. | DISCUSSION……………………………………………….. | 31 |
| | A. Section 1981………………………………………………. | 31 |
| | 1. Timeliness……………………………….………… | 31 |
| | i. Potential Contracts…………………………………. | 32 |

|  |  | ii. | Existing Contracts……………………………………..… | 39 |
|  | 2. | Scope of Coverage…………………..………………............... | | 46 |
|  | 3. | Evidentiary Framework……………………………….…... | | 51 |
|  |  | i. | *Prima facie* Case………………………………………. | 52 |
|  |  | ii. | Proffered Reasons for its Decision……………………….. | 52 |
|  |  | iii. | Pretext……………………………………………………. | 54 |
|  |  |  | a. Comments……………………………………… | 54 |
|  |  |  | b. E-mail……………………………………………….. | 58 |
|  |  |  | c. Disparate Treatment………………………………… | 59 |
|  |  |  | d. Absence of Investigation……………………………. | 68 |
| B. | Puerto Rico Law………………………………………………... | | | 69 |
|  | 1. | Tortious Interference with Contracts…………………………. | | 69 |
|  | 2. | Negligence……………………………………….………... | | 70 |
| VI. | CONCLUSION…………………………………………………….. | | | 71 |

## I.  PROCEDURAL DEVELOPMENTS

**A.  Initial Stages**

This case has spanned for more than six (6) years, generating substantial discovery and litigation.[4]  On July 13, 2009, Martínez and María Betancourt-Boria, his common-law wife, initiated the action against Universal and two unnamed defendants under 42 U.S.C. § 1981, for alleged interference (1) with Martínez' contracts, and (2) with Martínez' ability to form new contracts on account of his race and/or ethnic origin.  Additionally, they complained of tortious interference with contracts and of negligence under Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31 §§ 5141-42. See, Civil No. 09-1649 (DRD), Docket No. 1.  In

---

[4] Plaintiffs have filed six (6) complaint/amended complaints since the original complaint was filed on July 13, 2009. See, Civil No. 09-1649, Docket Nos. 1, 5 (July 16, 2009), 33 (October 19, 2010), 43 (November 16, 2010) and 158 (May 14, 2012); and Civil No. 11-2160 (PAD) Docket Nos. 1 (December 1, 2011), and 13 (June 12, 2012).

a fourth amended complaint filed on November 16, 2010, Ortiz was added as a defendant in her personal and official capacities. See, Civil No. 09-1649 (DRD), Docket No. 43.

On December 6, 2010, Universal moved to dismiss the fourth amended complaint at Docket No. 43, plaintiffs opposed the request, Universal replied, and plaintiffs surreplied. See, Civil No. 09-1649 (DRD), Docket Nos. 47, 55, 79-1, and 94, respectively. Ortiz also moved to dismiss and for joinder with Universal's motion to dismiss, all of which plaintiffs opposed. See, Civil No. 09-1649 (DRD), Docket Nos. 105 and 108. On April 4, 2011, the motions to dismiss were referred to a U.S. Magistrate Judge for a Report and Recommendation ("R&R"). See, Civil No. 09-1649 (DRD), Docket Nos. 106 and 107. On September 2, 2011, the Magistrate Judge entered a thorough R&R, recommending:

(1) Dismissal of all claims against Ortiz;

(2) Dismissal of all claims filed on behalf of Betancourt-Boria;

(3) That a one-year statute of limitations be applied to the Section 1981 action for interference with Martínez' ability to form new contracts, and a four-year statute of limitations be applied to allegations that Universal interfered with Martínez' existing contracts;

(4) That Martínez' Section 1981 claims for interference with ability to form contracts accruing prior to July 13, 2008 (a year before the Complaint was filed); be dismissed as time barred; and

(5) That the dismissal request be denied as to all remaining claims.

See, Civil No. 09-1649 (DRD), Docket No. 117.

On September 12, 2011, the parties filed objections to the R&R. See, Civil No. 09-1649 (DRD), Docket Nos. 118 and 119. On September 19, 2011, the court adopted in part the R&R. See, Civil No. 09-1649 (DRD), Docket No. 123 at pp. 27-28.[5]

_____

[5] The court adopted the R&R, except as to the issues of spoliation and Maria Betancourt's participation in the case. Civil No. 09-

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., *et al.*
Civil No. 11-2160
Opinion and Order
Page 5

## B.  New Litigation

On December 1, 2011, Martínez and Best Auto filed a new complaint with factual allegations similar to those included in Civil No. 09-1649 (DRD).  See, Civil No. 11-2160 (PAD), Docket No. 1.  The new case was consolidated with the original case.  See, Civil No. 09-1649 (DRD), Docket No. 130 at p. 1.  On June 12, 2012, plaintiffs filed an additional amended complaint in 11-2160 (PAD), Docket No. 13), incorporating the surviving claims in 09-1649 (DRD).[6]  The court then entered judgment dismissing the claims in 09-1649 (DRD) as duplicative (Civil 09-1649 (DRD), Docket No. 168), and the case continued as Civil No. 11-2160 (PAD).

On March 8, 2013, defendants moved for summary judgment (Docket Nos. 71, 78 and 80); plaintiffs responded (Docket Nos. 94, 106, 107 and 114); defendants replied (Docket Nos. 128, 132 and 133); and plaintiffs sur-replied (Docket No. 152).  On March 9, 2013, the motions for summary judgment were referred to a Magistrate Judge for R&R (Docket Nos. 88 and 89).  On October 1, 2013, the Magistrate Judge entered a comprehensive R&R (Docket No. 162), recommending that:

> (1) Martínez' Section 1981 claims arising after the incorporation of Best Auto on February 20, 2009 be dismissed;
>
> (2) Universal's motion for summary judgment as to remaining claims under Section 1981 be denied;
>
> (3) Ortiz' motion for summary judgment be denied; and
>
> (4) Claims for interference with contracts and negligence under Puerto Rico law be dismissed.

Id. at p. 96, n.81.

---

1649 (DRD), Docket No. 123 at pp. 27-28.

[6] Defendants moved to strike the Amended Complaint (Docket Nos. 19 and 20), plaintiffs responded (Docket No. 24), defendants replied (Docket No. 25), and the Court denied defendants' motion to strike (Docket No. 26).

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., *et al.*
Civil No. 11-2160
Opinion and Order
Page 6

On October 8, 2013, the parties filed objections to the R&R (Docket Nos. 163 and 164). Defendants filed an opposition to plaintiffs' objections (Docket No. 166, Attach. 1), and plaintiffs filed an opposition to defendants' objections (Docket No. 169). On March 27, 2014, the court entered an Omnibus Opinion and Order partially adopting the R&R (Docket No. 178).

**C. Claims Awaiting Adjudication**

With that ruling, the following claims remain for adjudication: (1) Martínez' Section 1981 claim for interference with ability to make contracts before February 20, 2009; (2) Martínez' Section 1981 claim for interference with contracts before February 20, 2009; (3) Best Auto's Section 1981 claims for interference with the making of contracts and with contracts after February 20, 2009; and (4) claims for tortious interference with contracts and negligence under Puerto Rico law.

None of the parties were content with the Omnibus Opinion and Order, and requested reconsideration.[7] After thoroughly evaluating the pending motions for reconsideration, the pleadings leading to this point, and all the evidence submitted by the parties, the court is convinced it must reconsider its prior ruling. For the reasons discussed below, plaintiffs' motion for reconsideration (Docket No. 182) is DENIED, and defendants' motion for reconsideration (Docket No. 192) is GRANTED.

## II.      SUMMARY OF ARGUMENTS

Plaintiffs seek redress under 42 U.S.C. § 1981, because Universal and Ortiz allegedly interfered with plaintiffs' contracts, and with their ability to form new contracts on account of Martínez' national origin and race. They take issue with Universal's interpretation of a clause in

---

[7] See, Plaintiffs' motion for reconsideration and defendants' opposition (Dockets Nos. 182 and 187); and defendants' motion for reconsideration, plaintiffs' opposition, and defendants' reply (Dockets Nos. 192, 199 and 207).

its insurance contracts to require clients of Best Auto to remove their cars from the shop and take them to another shop selected by Universal if they wanted Universal to pay for repairs.  They claim that Universal's interpretation of the clause is illegal under the Puerto Rico Insurance Code, and no more than a pretext to cover up prohibited discrimination (Docket No. 13 at ¶¶ 34, 101).

In line with that view, plaintiffs direct the court's attention to (1) xenophobic comments by some Universal employees; (2) a letter and an email sent by Ortiz in 2004; (3) the fact that Best Auto was "targeted," even though there were other problematic shops; and (4) Universal's failure to investigate allegations of racial comments made by a Universal employee.  According to plaintiffs, defendants' actions also give rise to claims for tortious interference with contracts and to claims for negligence under Articles 1802 and 1803 of the Puerto Rico Civil Code. Id.

Defendants counter that (1) their actions are permissible under a clause in Universal's policies, which allowed Universal to decide whether (i) to pay a claim; (ii) to repair the car in the shop of its choice; or (iii) replace the car, and (2) the Office of Insurance Commissioner of Puerto Rico ("OIC") validated the clause.  As to the decision not to pay for repairs in plaintiffs' shop, defendants posit that Ortiz decided to invoke the clause due to increasing conflicts between Universal and Martínez, and her undisputed perception of Martínez' disruptive behavior and defiance of Universal's adjustment process.  For Universal, this conduct reached its boiling point in 2007, when Ortiz received information that Martínez had spearheaded a frontal attack against what it considered two (2) essential business initiatives: the Repair Network, and the Auto Parts Discount Policy.  At that point, Ortiz made the decision challenged here (Docket No. 192 at pp. 6-7, 20-21).

Defendants contend that they harbored no discriminatory animus (1) as under Ortiz' direction Universal had for years paid for repairs done by Martínez (fully aware of Martínez' race

and national origin); (2) Universal's decision to implement the repair-option clause was contemporaneous to Martínez' efforts to dismantle Universal's Repair Network and Auto Parts Discount policy; and (3) that, as it was the case with Martínez for years, Universal had business relations with other similarly situated individuals regardless of their race or national origin.  That was true, notwithstanding the fact that Best Auto was never interested in joining Universal's Repair Network.  Id.

Finally, as to the alleged disparate treatment, defendants point out that no entity can be considered similarly situated to Best Auto.  They point out that the decision-maker (Ortiz), was not aware of racial comments related to plaintiffs, and that no such comments entered into the decision-making process leading to litigation. Id. at pp. 23-30. These conflicting views of the record must be tested against well-established principles governing motions for summary judgment under Fed. R. Civ. P. 56.[8]

### III.    STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party. It is "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

---

[8] In connection with this evaluation, the court thoroughly reviewed Docket No. 71, Appendix 1, Universal's "Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment." ("Universal's SUMF"); Docket No. 94, "Plaintiffs' Counterstatement of Material Facts in Opposition to Defendants' Motions for Summary Judgment and Plaintiffs' Additional Statement of Material Facts" (Plaintiffs' Opposing Statement of Material Facts, hereinafter "Plaintiffs' OSUMF"; Docket No. 128, Exh. 2 (Defendant's Reply to Plaintiffs' Opposition Statement of Material Facts, hereinafter "Universal's Reply SUMF"); Docket No. 163 (Plaintiffs' Objections to the R&R); and Docket No. 164 (Universal's Objections to the R&R).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting facts that demonstrate a genuine issue for trial. LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). All reasonable inferences must be drawn in favor of the non-movant. Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013).

To resist summary judgment, the nonmovant must do more than show some metaphysical doubt as to a material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The mere existence of a scintilla of evidence in support of that party's position will be insufficient to prevail at this stage. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Careful record review reflects absence of genuine dispute as to the facts identified in the section that follows.  Based on those facts, defendants are entitled to judgment as a matter of law.

## IV.    UNCONTESTED FACTS

The vast majority of the uncontested facts were laid out in the R&R (Docket No. 162), and in the Omnibus Opinion and Order (Docket No. 178).  Given the procedural background, however, all relevant material facts as to which no genuine dispute exists are set forth below.  Where appropriate, the court will provide the reasoning underpinning their adoption here.

### A.  Best Auto's Business

Best Auto is in the business of repairing automobiles. Universal's SUMF at ¶¶ 67-68; Plaintiffs' OSUMF at ¶¶ 67-68; Plaintiffs' SUMF at ¶ 1; Universal's Reply SUMF at ¶ 1. The shop has been in business under various names since 1973, always owned by Martínez and his common law wife, María Betancourt-Boria.  It was incorporated in February 2009, and since then, Martínez

and Betancourt have been the shareholders of the corporation, with Martínez as President. Universal's SUMF at ¶¶ 69-72; Plaintiffs' OSUMF at ¶¶ 69-72.

### B. Universal's Business

Universal is in the business of providing insurance; that is, it sells policies to clients assuming the risk of the losses caused by particular events (i.e. car accidents, theft, etc.), and, compensates the insured suffering a loss, pursuant to the terms of the policy. Universal's SUMF at ¶ 6 and Plaintiffs' OSUMF at ¶ 6.

### C. Universal's Claims Department's Structure

Co-defendant Ortiz led Universal's Claims Department from 2001 until mid-2010, when she retired. Universal's SUMF at ¶¶ 27 and 50; Plaintiffs' OSUMF at ¶¶ 27 and 50. She had the authority to establish Universal's policy on how to deal with repair shops. Plaintiffs' ASUMF at ¶ 9; Universal's Opposition to Plaintiffs' ASUMF at ¶ 9. During that time, she led monthly meetings in the department to discuss how claims should be handled.

Supervisors would discuss their concerns, and Ortiz would provide them with direction and guidance on how to resolve claims if need be. Universal's SUMF at ¶ 25; Plaintiffs' OSUMF at ¶ 25. Only Universal's management (i.e. Assistant Vice Presidents "AVP", managers and supervisors), participated in those meetings. Universal's SUMF at ¶ 31; Plaintiffs' OSUMF at ¶ 31. Ortiz and Martínez met at some point in 2001 because Martínez requested a meeting to discuss rumors that a Universal employee accused him of installing stolen parts. Universal's SUMF at ¶ 110; Plaintiffs' OSUMF at ¶ 111.[9] At least since then, Ortiz was aware of Martínez' race.

---

[9] Plaintiffs' opposition to paragraphs 105 through 114 of Universal's SUMF are misnumbered.

### D.  Loss-Liquidation Clause

Universal's policies contain a clause titled "Loss Liquidation," which provides that once a claim is submitted Universal has the contractual right to either pay the claim (i.e. in cash); repair the vehicle; or replace it. Universal's SUMF at ¶¶ 12, 14 and 15.  If Universal decides to repair the vehicle instead of paying for the loss, it may do so in the shop of its choice. Id.  The OIC evaluated Universal's interpretation of the Loss Liquidation Clause, and validated it.[10]

Plaintiffs denied these facts in their OSUMF (Plaintiffs' OSUMF at ¶¶ 12, 14-15).  But the denials are conclusory, stating simply that Universal "concocted" this interpretation to impair plaintiffs' contractual relations with their clients, and that this interpretation is "illegal." They argued that the OIC's determination is not conclusive because the letter issued was signed by Mrs. Doris Diaz, who is not an attorney, and referred to additional facts proposed in their separate statement of additional facts.  However, some of those assertions are unrelated to the matter at hand (i.e. the fact that plaintiffs sent a letter to Universal complaining of an adjuster's comments; the fact that Universal did not investigate such letter). Others are premised on a conclusory allegation (i.e. that Universal's interpretation of the clause was a pretext for discrimination). See, Plaintiffs' OSUMF at ¶¶ 14-15 and Additional Statements of Material Facts ("ASMF"), Docket No. 94 at pp. 44-95 at ¶¶ 38-39, 85 and 87.

---

[10] In January 2008, a client of plaintiffs, Mr. David Alemán-Pacheco, filed a complaint with the OIC because he did not agree with Universal's decision to remove his car from Best Auto. Universal's SUMF at ¶ 200 and Plaintiffs' OSUMF at ¶ 200.  The OIC notified him on November 7, 2008, that the policy permitted Universal to decide to repair his car on the shop of Universal's choice. Although the notice stated that if Universal's decision stemmed from animosity it could be in violation of the Insurance Code, the OIC later concluded that nothing in Universal's actions violated the Insurance Code or its regulations, nor merited sanctions. Universal's at SUMF ¶¶ 200-203;  Plaintiffs' OSUMF at ¶¶ 200-203; Universal's Reply to Plaintiffs' OSUMF at ¶ 202; and Docket Nos. 131 and 158, Exh Nos. K and K-1. Martínez admittedly instigated policy holders to file charges against Universal before the OIC. Alemán-Pacheco initiated an action in this district. In a thorough report and recommendation, a magistrate judge agreed with Universal's position. See, Alemán-Pacheco v. Universal Insurance Group, et al., Civil No. 13-1459 (JAG/CVR) at Docket No. 115. The sister court reached the same conclusion, approved and adopted the magistrate judge's report and recommendation, and dismissed the complaint. Id. at Docket No. 122. The First Circuit affirmed. See, Aleman-Pacheco v. Universal Group, Inc., ---Fed.Appx.----, 2016 WL 1127744 (March 23, 2016).

A reading of the clause shows there is nothing ambiguous about its language and, therefore, that the parties are bound by its terms.  López & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58, 64-65 (1st Cir. 2012)(where a contract's wording is explicit and its language unambiguous, the parties are bound by its clearly stated terms and conditions, with no room for further debate); Nieves v. Intercontinental Life Ins. Co. of Puerto Rico, 964 F.2d 60, 63-64 (1st Cir. 1992)("[i]f the wording of the contract is explicit and its language is clear, its terms and conditions are binding on the parties."); Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st  Cir. 1994)(where no doubt or ambiguity lies amidst the meaning of a contract's terms, "the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract").  Likewise, the fact that the employee who signed the letter may not have been an attorney is inconsequential, for she was signing the letter, not in her personal capacity, but in her official capacity as a representative of the OIC, the agency in charge of regulating insurance matters in Puerto Rico.[11]

### E.  Claim Adjustment Process

A claim process follows notice of a loss.  Universal's SUMF at ¶ 7 and Plaintiffs' OSUMF at ¶ 7.  Normally, upon notice, Universal refers the claim to an adjuster in its Claims Department (or to an external adjuster).  The role of the adjuster is, generally, to maintain communication with the insured, coordinate the vehicle's inspection, and eventually make the proper adjustments to the claim.  Universal's SUMF at ¶ 8; Plaintiffs' OSUMF at ¶ 8. The process is conducted in accordance with the terms of the insurance policy under the scrutiny of Universal's management.  Id.

---

[11] Plaintiffs have pointed to several employees who, at some point, thought that the loss-liquidation clause could not prevent third-party claimants from deciding where to repair their cars.  That those employees so thought is inconsequential. Different people, especially lay persons, may have different interpretations as to the meaning of a contract.  Whether a contract is clear raises a legal issue for the court to decide.  And as stated above, the contract here is unambiguous.

Under the policy, the insured must: (1) cooperate during the investigation, liquidation, or defense of the claim; (2) keep Universal apprised of legal documents and notifications related to the accident or loss; (3) authorize Universal to obtain medical documents and other relevant documents; (4) present evidence of the loss; (5) take reasonable steps to protect the property from further damage; and (6) permit Universal to inspect the property before it is repaired or destroyed. Universal's SUMF at ¶ 10.[12]  If an insured fails to comply with these terms, Universal may deny the claim without payment. Universal's SUMF at ¶ 11 and Plaintiffs' OSUMF at ¶ 11. Although Martínez is not party to the insurance contract, he is cognizant that if his client was going to pay for the repair, he had to wait for the insurance company to inspect the car and conduct the adjustment process before repairing the car. Universal's SUMF at ¶ 126; Plaintiffs' OSUMF at ¶ 126.

During the adjustment process, Universal may determine the vehicle is a total loss.  The Puerto Rico Insurance Code, authorizes insurers to declare a vehicle "total loss" if it cannot be repaired; or a "constructive total loss" if the cost of repairing the vehicle would exceed 60% of the vehicle's value at the time of the loss. Universal's SUMF at ¶¶ 17-18 and Plaintiffs' OSUMF at ¶¶ 17-18. Similarly, the Insurance Code provides that any such determination may be made, exclusively, by a licensed adjuster. Universal's SUMF at ¶ 19.[13]  Plaintiffs' clients would, at times, be insured by Universal, and would be interested in having Universal pay for their vehicle's repair. It is in this context that plaintiffs' claims arise.

---

[12] The court rejects plaintiffs' denial because it is primarily based on the argument that Universal does not have these rights under the Puerto Rico Insurance Code (Plaintiffs' OSUMF at ¶ 10).  The insurance policy does, in fact, contain the wording proffered by Universal.  And plaintiffs have not questioned the authenticity of the insurance contract.

[13] Plaintiffs denied this fact arguing that the owner may decide to repair the car, even in the event of a total loss.  Their argument does not, however, negate provisions in the Insurance Code on who may declare a car a total loss and under what circumstances. Accordingly, the court rejects the denial.

### F.  Conflicting Situations between the Parties

Universal has referred to a wide array of instances where Martínez obstructed the claims adjustment process or challenged Universal's determinations; pointed to personal conflicts between Martínez and several of Universal's employees; and identified situations where Martínez' actions led to conflicts between Universal and Universal's clients (Universal's SUMF at ¶¶ 114-118).  Many of these incidents were denied by plaintiffs, and some were objected as hearsay (Plaintiffs' OSUMF at ¶¶ 114-118). Universal challenged plaintiffs' posture, arguing that it presented these facts to portray the situations of which Ortiz was informed, and which she took into account in deciding what to do with Best Auto (Docket No. 128, Exh. 1).  The court agrees with Universal, for whether those situations occurred exactly as portrayed by Universal in its SUMF is not relevant.  But the fact that Ortiz received that information is.

The alleged inaccuracy, and the fact that they are brought by way of Ortiz' statement, is not an obstacle for the court to consider these facts admitted for the purpose of assessing their impact on Ortiz' mindset in determining how to address those situations.  See, Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, n.1 (1st Cir. 2009)(affidavit of person who evaluated information received in order to make the disputed business decision suffices for summary judgment purposes; the affidavit was not inadmissible hearsay because it was not brought to prove the truth of the underlying statement, but to establish the employer received and relied on the information; whether plaintiff contested the veracity of the underlying information is irrelevant.); Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria--Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005)(same); Ramírez-Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 77 (1st Cir. 2005)(same).

### G.  Complaints about Martínez' Conduct

The record shows that the complaints received by Ortiz throughout the years included, among others, complaints that Martínez: (1) often pretended to proceed as a licensed public adjuster, questioning the adjuster's determination on whether a particular damage to the vehicle or part of a vehicle was repairable; (2) would discuss his disagreements regarding the adjusters' determination with the insured, causing conflicts between Universal and the insured; (3) yelled at some of Universal's employees; (4) bad mouthed Universal in front of clients, making comments such as that Universal was a mafia, and its President a mobster; (5) obstructed the adjusters' job by placing obstacles to inspections; (6) impeded or restricted Universal's right to inspection; and (7) refused to honor Universal's total loss determinations by repairing the car after being informed that the car was a total loss.

Even though the record includes various examples of Martínez' disrespectful conduct and challenging actions toward Universal's processes, the court considers some particularly troublesome.  For example, according to information provided to Ortiz by Mr. Ángel Molina, a Universal adjuster, during one visit to plaintiffs' shop, Molina told Martínez that the hood of a car he was inspecting could be repaired instead of replaced.  According to Molina, Martínez voiced his disagreement by removing the hood from the car, throwing it on the floor, jumping on top of it, and asking Molina:  "Can it be repaired now?"  Universal's SUMF at ¶ 114(i).  This conduct, challenging whether a part could be repaired instead of replaced, was also experienced by another adjuster, Mr. Isaac Villegas, who relayed the information to Ortiz.  Universal's SUMF at ¶ 114 (l).

Based on information received by an independent third-party adjuster, Mr. Eric D. Ryan, during one of his visits to Best Auto, Martínez restricted his job, telling Ryan that: (1) he could only take pictures of the car's license plate and engine; (2) he was not allowed to remove the car's

filter to inspect the engine oil; (3) he would not allow the adjuster to do anything else because the car had been sitting on his shop for 3 days and his shop was losing money; and (4) he must delete any pictures taken in his shop. Universal's SUMF at ¶ 114(h).  Ryan told Martínez he could not do his work as an adjuster under those conditions, and left plaintiffs' shop. Id.

### H.  Plaintiffs' Disregard of Universal's Total Loss Findings

Another adjuster, Mr. Mario Fonseca informed Ortiz that, during a visit, he told Martínez that a particular car was a total loss. Martínez replied that he would still repair the car, and stated that Universal was deceiving its clients. Universal's SUMF at ¶ 114(j). The record shows that this problem was faced by Universal several times. A notable case dates back to 2004, when a policyholder, Mr. Fernando Negrón-Quero, filed a claim asking Universal to inspect his car at Best Auto. Universal's SUMF at ¶ 118(a); Plaintiffs' OSUMF at ¶ 118(a). After inspecting the vehicle, Universal concluded that it was a total loss, and instructed Martínez not to repair it. Universal's SUMF at ¶ 118(c); Plaintiffs' OSUMF at ¶ 118(c). Martínez disregarded this determination and repaired the car. Universal's SUMF at ¶ 118(d); Plaintiffs' OSUMF at ¶ 118(d).

Later, Universal faced a similar scenario with a claim filed by policyholder Linda González. After an adjuster, Mr. Pedro Villegas, determined the car was a constructive loss (for the cost of repair exceeded 60% of the car's value), Martínez repaired the car in total disregard of Universal's determination. Universal's SUMF at ¶ 118(f)-(g); Plaintiffs' OSUMF at ¶ 118(f)-(g). In an attempt to salvage the situation, Universal offered to pay the claimant (González) less than the estimated cost, with the caveat that it would not cover hidden damages. Universal's SUMF at ¶ 118(h); Plaintiffs' OSUMF at ¶ 118(h).

## I.   Universal's Initial Response

Troubled by these situations, in October 2004 Ortiz sent a letter to Martínez warning him that his challenge to Universal's total loss determination was improper, and reminding him that those determinations were exclusive to Universal.  She warned him that his actions caused conflicts between Universal and its clients, and asked that he refrain from interfering with Universal's business in the future. Universal's SUMF at ¶¶ 119-120; Plaintiffs' SUMF at ¶¶ 119-120. Plaintiffs' opposing papers add that after sending this letter, Ortiz forwarded the letter to a supervisor, Olga de la Rosa, telling her that the letter was only the beginning of her documentation to legally get rid of Martínez. She titled the email "joy," and told De la Rosa that she made it real pretty, and that she would enjoy it. Plaintiffs' ASUMF at ¶ 32; Universal's Reply ASUMF at ¶ 32.

After Ortiz sent the letter to Martínez, she issued a memo to all Universal's supervisors, instructing them not to give in to Martínez' "unreasonable demands" and to refrain from negotiating estimates with him. Universal's SUMF at ¶¶ 122-123. At another point, Universal relayed the message to Martínez that he was interfering in the adjustment process, acting as a public adjuster, something for which he needed a license that he did not have.  Universal's SUMF at ¶ 129; Plaintiffs' OSUMF at ¶ 129.[14]

After the October 2004 letter, Martínez continued to challenge Universal's adjustments, and particularly important here, those concerning total losses.  To that end, in 2006 policyholder Alexandra López-Rivera filed a claim supported by an estimate from Garage Richie & Frank

---

[14] In fact, Martínez was not a licensed public adjuster, which is a licensed field in Puerto Rico.  See, Article 9.060 of Insurance Code, P.R. Laws Ann. tit. 26 § 101, et seq.

Brothers Inc. After inspection and adjustment, Universal determined that the car was a constructive total loss, exceeding 60% of the car's value.

Universal made López-Rivera an offer, and later closed the claim because she failed to respond. A month later, Martínez presented a different estimate to repair Lopez-Rivera's car. Universal informed Martínez that it had already concluded that Lopez-Rivera's car was a constructive total loss and could not be repaired. Despite this information, Martínez repaired the car. Although Universal initially refused to pay, following requests by Lopez-Rivera's father it eventually decided to settle the claim for an amount below the estimate. According to Universal's records, Martínez accompanied Lopez-Rivera's father during one of the visits when he requested that Universal increase the initial offer for payment. Universal's SUMF at ¶¶ 133-140; Plaintiffs' OSUMF at ¶¶ 133-140.[15]

A similar incident occurred in 2007, when policyholder Gilberto A. Valle filed a claim and Universal determined that his car was a total loss.[16] Universal's adjuster, Mario Fonseca, informed Martínez of the total loss determination. Valle sent a letter to Universal authorizing Martínez to repair the car with used parts, instead of new ones, in order to reduce the repair cost. Universal maintained its determination, but made Valle an offer, which Valle rejected. In that case, Universal and Valle were unable to reach an agreement, and Valle's claim was closed without payment. Universal's SUMF at ¶¶ 142-150; Plaintiffs' OSUMF at ¶¶ 142-150.

---

[15] Plaintiffs tried to deny this incident alleging that Universal did not produce this file during discovery.  Universal provided evidence that it produce the file (see, Universal's Reply at Docket No. 128, Exh. 1 at ¶ 133 and Docket Nos. 130 and 131, Exhs. G, H and I), which plaintiff did not contest.

[16] Plaintiffs admitted the facts related to Valle's claim, yet argued that Universal did not produce this file during discovery.  As with López-Rivera's claim, their argument is unsupported.  Universal proved otherwise. Plaintiffs' OSUMF at ¶ 142; Universal's Reply to Plaintiffs' OSUMF at Docket No. 128, Exh. 1 at ¶ 142.

All of these incidents were informed to Ortiz, who perceived Martínez as one who was disregarding Universal's decisions. Universal's SUMF at ¶ 151; Plaintiffs' OSUMF at ¶ 151.  In turn, the events served as the foundation for the core of the matter: Ortiz' decision not to pay for repairs in plaintiffs' shop in 2007. According to Universal, there were a series of key events that tipped the scale and prompted swift action.

### J.  Universal's Repair Network

In an effort to reduce premium costs and provide added value to customers, Universal established an Auto Repair Shop Network.  It is comprised of approximately 115 repair shops, all of which elected to participate in the program. The Network includes shops owned by black individuals and/or Dominican nationals. Universal's SUMF at ¶ 66.  The shops execute a contract with Universal whereby they agree to negotiate directly with Universal and accept Universal's adjustments.  Universal's SUMF at ¶ 60.  In exchange, they receive exposure within Universal, for Universal's clients receive a list of the Network participants.  After the adjustment process is completed, Universal pays the shop directly, instead of through the insured.  Universal's SUMF at ¶¶ 60, 61.

The program is designed to speed up the adjustment process, reduce repair and operating costs, and add value to Universal's customers, who receive quicker and guaranteed repair services. Universal's SUMF ¶¶ 59-62; Plaintiffs' OSUMF at ¶¶ 59-62.[17]  Thus, Universal values the Network as an important business strategy.  Martínez was not part of the Network by his own

---

[17] Plaintiffs attempted to deny these statements without citing any evidence in support. Plaintiffs' OSUMF ¶¶ 59, 61-62.  The court, thus, disregards their denials. See, Local Rule 56(c)("Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule."); Local Rule 56(e)("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted").  Also, plaintiffs argued the Network does not lower costs. But this is premised in Martínez' own opinion and in a conclusory fashion. Given that Martínez does not work at Universal, he cannot testify as to the effect the Network has in the repair costs or as to the intended derivative benefits.

accord, as he was never interested in partaking in it.  Universal's SUMF at ¶ 104; Plaintiffs'

OSUMF at ¶ 104.

### K.  Parts Discount Policy

Universal planned to implement a new Parts-Discount Policy. Universal's SUMF at ¶ 153.

Generally, repair shops receive substantial discounts from auto manufacturers in the cost of auto

parts.  By 2007, these discounts could range from 20% to 45%, depending on the car's make and

model.   Universal's SUMF at ¶ 154. Despite the discount, repair shops would charge the

undiscounted price to insurance companies. Id.

Universal's intention was to reduce the estimates prepared by repair shops to account for

the discount, decreasing the cost of repair and eliminating overstated costs. The policy would apply

equally to all repair shops.  Universal's SUMF at ¶¶ 153-156.  By implementing the Discount

Policy so that the savings would flow to policyholders, Universal intended to eventually provide

more competitive insurance premiums.

### L.  Efforts to Boycott Universal's Business Initiatives

Universal's plan to implement the Parts Discount Policy did not suit some of the repair

shops. Martínez and Eduardo Puig, the owner of Borinquen Body shop, decided to create a

Committee to oppose the discount policy.[18]  Initially, they created the Committee consisting of

approximately ten (10) shop owners who were members of the Auto Collision Shop Owners

Association. Martínez joined the Association and, contemporaneous with the events under the

---

[18] Although the parties have conflicting versions of how the Committee was created or on whose initiative, Martínez' testimony shows that he received a call from Puig and that he invited him to create the Committee, which they did as a joint effort.  See, Docket 115, Exh. 3 at p. 78.  The record is devoid of evidence suggesting that Ortiz came to learn about Puig's involvement in the formation of the Committee or the boycott.

court's perusal, became its co-President and in charge of Puerto Rico's metropolitan area.  His co-President was Nélida Mass.

On August 22, 2007, the Association met to discuss the discount policy that was going to be launched by Universal.  During the meeting, Martínez sat at the head of the table next to the Presidential Chair.  From there, Martínez urged the attendees to amass efforts to protect themselves from the insurance companies' alleged abusive treatment and to fight for their "rights."  He also argued specifically against Universal's discount policy because, according to him, it would make it very difficult for shops to repair Toyota cars.  Although Martínez was aware that another insurance company (Cooperativa de Seguros Multiples) had plans to implement a similar policy, there was no discussion about that plan.  Universal's SUMF ¶¶ 157-164 and 173-174; Plaintiffs' OSUMF ¶¶ 157-164 and 173-174.

During the meeting, a motion was presented to encourage shop owners that were part of Universal's Network to disassociate from the Network because it represented a conflict of interest with the purpose of the Committee.  Martínez voiced his concern with the Network and backed the notion that it created a "conflict of interest."  Prior to the meeting, Martínez and the Committee had already discussed concerns regarding the Network and the alleged conflict of interest. Universal's SUMF at ¶¶ 165-167; Plaintiffs' OSUMF at ¶¶ 165-167. According to Martínez, the owner of Garage Colón was also vocal about Universal during the meeting.[19] Plaintiffs' ASUMF at ¶ 166; Universal's Reply to Plaintiffs' ASUMF at ¶ 166.  Twenty-one (21) shop owners agreed to withdraw from the Network.  Universal's SUMF at ¶ 168; Plaintiffs' OSUMF at ¶ 168.

---

[19] There is no evidence on record that Ortiz was privy to this information.

Two days later, on August 24, 2007, Ortiz learned about the shop owners' request to withdraw from the Network because she received a letter signed by Martínez and Mass, as co-Presidents of the Association, explaining the situation.[20] That same day, Ortiz was informed via email that Martínez and Mr. Oscar Nieves, owner of Body Shop Manufacturing, were the leaders behind the now-executed plan to boycott Universal's Discount Policy.  On August 29, 2007, she sent a letter to the shops accepting their withdrawal from the Network. Universal's SUMF at ¶¶ 168-171, 175; Plaintiffs' OSUMF at ¶¶ 168-171, 175.

Shortly after Ortiz received the letters to withdraw, on September 21, 2007, she received a complaint from adjuster Ryan, discussed above, complaining that Martínez was obstructing his work (putting limits on what he could and could not do during inspection), to the point where he had to leave the shop's premises.  Around the same time, she received information from OIC that Martínez had instigated some of Universal insureds to submit complaints against Universal, internally and with the agency.  Martínez admitted that he assisted some of his clients in preparing documents to complain about Universal's determinations within the adjustment process. Universal's SUMF ¶ 176; Plaintiffs' OSUMF ¶ 176.[21]

### M. Universal's Reaction

On September 21, 2007, Ortiz decided that Universal's claim supervisors would no longer visit plaintiffs' shop for inspections, and instructed that policy holders would have to make the vehicle available for inspection somewhere else. She also instructed that all claims in which Best

---

[20] Aside from the fact that Mass signed that letter, Universal attests that it never had any quarrels with Mass or her shop. Universal's SUMF ¶ 172; Plaintiffs' OSUMF ¶ 172.

[21] Plaintiffs argued these facts are supported by inadmissible hearsay and offer a conflicting version. Since Universal brings the statement for the effect on Ortiz rather than for the truth of what Ryan stated, it is admissible for this limited purpose.  Thermo King, 585 F.3d 441, n.1; Ronda Pérez, 404 F.3d at 45; Ramírez, 425 F.3d at 77.

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., *et al.*
Civil No. 11-2160
Opinion and Order
Page 23

Auto was involved had to be referred to either AVPs Brenda Rivera or Enrique Polanco for processing.  Universal's SUMF ¶¶ 177-178 and 180; Plaintiffs' OSUMF ¶¶ 177-178 and 180.[22] According to Ortiz, she took into consideration all of the increasing conflicts she had faced with Martínez up to that point, including altercations between Martínez and Universal's personnel; the challenges to Universal's adjustments and total loss incidents, which created conflicts between Universal and its clients; Martínez' collaboration in seeking to dismantle Universal's Network; and Martínez' instigation to insureds to file claims against Universal with the OIC.  Universal's SUMF ¶ 179; Plaintiffs' OSUMF ¶ 179.[23] On October 5, 2007, after consulting Universal's Legal Department, Ortiz decided that Universal would inform insureds that it did not maintain commercial relations with Best Auto. Universal's SUMF ¶ 181; Plaintiffs' OSUMF ¶ 181.[24]

On October 8, 2007, Emilio Morales, one of Universal's claim supervisors, informed all of the employees of the Claims Department via email about Ortiz' decision.  In line with that decision, he stated that Universal would no longer maintain commercial relations with plaintiffs' shop; that Universal's adjusters would no longer inspect vehicles at plaintiffs' shop; and that Universal's clients should be informed that they would have to remove their cars from plaintiffs' shop for inspection elsewhere.

---

[22] Plaintiffs denied the instruction by referring to the testimony of a former adjuster, Juan Sánchez Huertas, to prove that Ortiz' instructions were discriminatory.  Sánchez-Huertas' testimony does not support this proposition, as is discussed more thoroughly below.

[23] Plaintiffs denied this fact, arguing that the only factor considered by Ortiz was Martínez' race.  Yet Martínez recognized during his deposition that he ignores the factors considered by Ortiz in making her decisions regarding Best Auto.  All plaintiffs offer to support their conclusion is, simply, Martínez' subjective belief that Ortiz was moved by discrimination.  The court deems Martínez' subjective belief insufficient to establish illegal discrimination.  See, Mariani-Colón v. Dept. of Homeland Sec., 511 F.3d 216, 222 (1st Cir. 2007)(suspicion that one is being discriminated against is insufficient to prove illegal discrimination).

[24] Plaintiffs purported to deny this fact, without evidence in support of the denial.  Thus, the denial is rejected.

In November 2007, Universal received letters from several shops that had requested to withdraw from the Network in August of 2007, this time requesting to be reinstated into the Network. Some informed that Martínez had a leading role in the August meeting, that he had allegedly deceived them into withdrawing from the Network, and that Martínez was perceived as having a "personal vendetta" against Universal. Universal's SUMF ¶¶ 182-190; Plaintiffs' OSUMF ¶¶ 182-190.[25]  In one such letter, Mr. José Colón (from Garage Colón), informed Ortiz that he offered some alternatives to negotiate the issue of the discount policy with Universal and that although he signed the petition to withdraw from the Network, he had requested Martínez not to deliver it to Universal until the Association had the opportunity to meet face-to-face with Universal to discuss these matters.[26] According to Colón, Martínez sent the letter to Universal despite his contrary instructions; a fact that Colón learned when he received a letter from Ortiz accepting his withdrawal. Universal's SUMF ¶¶ 185-186; Plaintiffs' OSUMF ¶¶ 185-186.

Similarly, Mr. Oswald Stines (Caribe Auto Centro) indicated that the August 2007 meeting was presided by Martínez, and that the main discussion centered on developing a scheme to frustrate Universal's discount policy. Universal's SUMF ¶ 187; Plaintiffs' OSUMF ¶ 187.  Then, Mr. Angel Rosario (Garage Pucho), stated that he agreed to withdraw from the Network due to economic pressures. Universal's SUMF ¶ 189; Plaintiffs' OSUMF ¶ 189. He indicated that he perceived Martínez' using the Association to carry out a personal vendetta against Universal, and thus, questioned why the movement was not directed toward other insurance companies.  Id.  He

---

[25] Plaintiffs admitted the letters were sent but argued that Ortiz procured the letters.  Although the court notes some letters appear to suggest Ortiz requested them, it does not read too much into it.  Without additional information, the court cannot extend this simple fact to conclude, as plaintiffs suggest, that Ortiz asked these shop owners to lie.  Assuming, *arguendo,* that the letters in question were in fact requested, it does not deviate from the fact that at the end of the day, Ortiz received the information.

[26] Although Martínez testified that Garage Colón was vocal about Universal during the August 2007 meeting, the record does not show that Ortiz knew about it.

was not convinced by Martínez' explanations. Id.  Ortiz evaluated all of these letters.  Universal's SUMF ¶ 190; Plaintiffs' OSUMF ¶ 190.

In November 2007, the Claims Department held a meeting during which Ortiz informed attendees that she had received information that Martínez had filed a claim with the OIC against Universal, but under a different name. During this meeting, it was also discussed that Universal was considering legal action if Martínez continued to defame the Company. Universal's SUMF ¶ 192; Plaintiffs' OSUMF ¶ 192.[27]

On December 3, 2007, Ortiz instructed that for every claim related to Best Auto, Universal should send a letter informing the insured that Universal was exercising its right to repair the car pursuant to the repair clause section in the policy, and requesting that the client remove the car from Best Auto so it could be transferred to Universal's shop of choice, at Universal's expense. Universal's SUMF ¶ 193; Plaintiffs' OSUMF ¶ 193.[28]  Plaintiffs believe this result was due to race discrimination.  Universal, in turn, contends it was a legitimate measure to protect its business.

**N.  Effects of Decision**

From that point, Universal would sent a letter to those of its clients (insureds) interested in having Best Auto repair their car.  The letter stated that Universal was exercising its right to repair the car under the repair-clause section of the policy, and asked the insured to remove the car from Best Auto so it could be transferred to Universal's shop of choice at Universal's expense.  The

---

[27] Plaintiffs admitted that this issue was discussed during the meeting, according to the Minute, but denied having filed any claims against Universal.  As discussed earlier, because the veracity of the fact is not at issue but rather the fact that Ortiz was informed of Martínez' alleged claims with the OIC, the court admits it for this limited purpose.

[28] Plaintiffs denied this fact, arguing that the decision was really to create a separate structure for plaintiffs.  The court has already addressed the fact that Ortiz ordered that all claims involving Best Auto were to be handled by Ms. Rivera or Mr. Polanco.  None of the allegations or arguments stated by plaintiffs in their opposing papers tends to deny the fact that it was Ortiz who made the decision.

decision confronted some resistance among some of the insureds.   On the record the court has reviewed:

- On June 4, 2008, Rosa Lázaro-San Miguel received a letter from Marisol Lugo, a Universal adjuster.   The record is devoid of any facts about what happened thereafter or what employees were involved in the claim adjustment process.   There is a letter on record suggesting that Universal paid the claim two (2) days later, but no indication as to where the car was repaired. Plaintiffs' ASUMF at ¶ 90(a)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 90(a)(1). Plaintiffs' ASMF at ¶ 90(a)(1); and Docket No. 103, Exh. 32.

- Sometime in July 2008, Wilfredo Valentín took his car to Martínez' shop for repairs, as he had done in the past. Plaintiffs' ASUMF at ¶ 64(a)(1)-(2).[29] Pursuant to Ortiz' orders, Valentín went to Universal's Guaynabo office, where he waited for a prolonged time, and was questioned by an unnamed employee about Martínez' estimate. Id. at ¶ 64(a)(2). According to plaintiffs, Valentín was referred to this office on Ortiz' instructions. Valentin was told to take his vehicle to Borinquen Body instead of Martínez' shop. He testified that no one would tell him what the problem was with Martínez. Id.   When Valentín insisted that his car be repaired by Martínez, an unnamed Universal employee got angry and ordered him to wait in the lobby. Id. ¶ 64(a)(3). Eventually, Universal paid Valentín's claim, but only after arguing over Martínez and the estimate for his repairs. Id. at ¶¶ 64(a)(4)-(6); see also, Universal's SUMF at ¶ 83; Plaintiffs' OSUMF at ¶ 83.   Valentín has since continued having his car repaired by Martínez. Universal's SUMF at ¶ 84; Plaintiffs' OSUMF at ¶ 84. Valentín did not provide the names of the employees involved in the process.

- In or around March and August 2009, José Martino was told by Universal not to repair his car at Best Auto. After haggling with Enrique Polanco, plaintiffs were allowed to perform the repair. Plaintiffs' ASUMF at ¶ 90(a)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 90(a)(1).

---

[29] Although Plaintiffs' refer to Martínez' shop as Best Auto, the uncontested evidence shows that Best Auto was not incorporated until February 20, 2009. See, Universal's Reply to Plaintiffs' OSUMF No. 71. Hence, all reference to Best Auto before such date is inaccurate and, therefore, the Court will instead refer to Martínez' shop.

- In 2010, José Maldonado-Rodríguez took his car to Best Auto for repair. Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(1). In order to file the corresponding accident claim, Maldonado went to Universal's Guaynabo office, where Maryann Santos Bonilla (who according to Maldonado, was very cordial) assisted him and told him that Best Auto could not repair his car. He was told that he could take his car to any other repair shop, except for Best Auto. Plaintiffs' ASUMF at ¶ 64(b)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(2). He was offered no explanation as to why he could not have his car repaired at Best Auto, but was given a list of alternative shops. Plaintiffs' ASUMF at ¶ 64(b)(3); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(3). Eventually, Maldonado pointed out to Olga de La Rosa (a Universal supervisor) that Universal was violating his insurance policy; Universal then inspected Maldonado's vehicle and paid his claim. Plaintiffs' ASUMF at ¶ 64(b)(6); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(6).

- In 2010, Joaquin Monserrate-Matienzo went to Best Auto to have his vehicle repaired. On December 21, 2010, the car was towed from Best Auto's premises and taken to be repaired at Borinquen Body. Plaintiffs' ASUMF at ¶ 73; Universal's Opposition to Plaintiffs' ASUMF at ¶ 73.

- Sometime after 2010, Juan Trinidad-Martínez filed a claim on his wife's car. According to him, Universal adjuster Enrique Jimenez-Grau told him he had to bring an estimate from a shop on a list he provided or else his claim would not be resolved. Plaintiffs' ASUMF at ¶ 64(d)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(d)(2). Trinidad then enlisted the help of his insurance broker. Plaintiffs' SUMF at ¶ 64(d)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(d)(2). After speaking with a Universal supervisor and haggling over estimates, Universal eventually agreed to pay the claim. His vehicle was repaired at Best Auto. Plaintiffs' ASUMF at ¶ 64(d)(3)-(4); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(d)(3)-(4). On two subsequent occasions, Universal initially denied Trinidad's demand to have his vehicle repaired at Best Auto, though both times Universal

backed down, agreeing to pay for the repairs. Plaintiffs' ASUMF at ¶ 63(d)(5); Universal's Opposition to Plaintiffs' ASUMF at ¶ 63(d)(5).[30]

- In or around March 2012, Ramon Rivera-Silva was told that Universal did not "do business with that man, Elvis [Martínez]." When Rivera persisted, Universal allowed the repair to be done by Best Auto. Plaintiffs' ASUMF at ¶ 90(a)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 90(a)(2).

- In two other occasions Universal agreed to pay more for claims if the insureds agreed not to have their cars repaired at Best Auto. First, Pedro Torres had his car removed from Best Auto and taken to Borinquen Body, which was paid more than the amount in plaintiffs' estimate. Plaintiffs' ASUMF at ¶ 71; see also, Docket No. 126, Exh. 3 at p. 94. In a second case, Jose Guevara-Casellas had his car removed from Best Auto and moved to Borinquen Body after Universal agreed not to apply depreciation. Plaintiffs' ASUMF at ¶ 71; see also, Docket No. 144, Exh. 20 at p. 1 ("In this case, it was agreed not to apply depreciation costs, because the insured agreed that the car could be removed from [Best Auto].")[31]

### O. Other Body-Shops

Universal cut off ties with other body shops. To this end:

- In 2003, Taller Tomás Serrano was removed from the Network because it had overstated estimates. Universal's SUMF at ¶ 236; Plaintiffs' Opposition SUMF at ¶ 236.

- In 2004, Auto Collision was removed from the Network after Universal received a complaint against it. Universal's SUMF at ¶ 233; Plaintiffs' Opposition SUMF at ¶ 233. Auto Collision requested reinstatement, but the request was denied. Universal's SUMF at ¶ 234; Plaintiffs' Opposition SUMF at ¶ 234.

---

[30] Trinidad testified he perceived some kind of discrimination; however, when asked why he believed this, he did not offer any facts except for his perception. Also, he admitted that he never received any reasons from Universal as to why he could not take his car to Best Auto. See, Docket No. 101, Exh. 24 at pp. 16-20.

[31] Universal attempted to deny the facts contained in this paragraph, but the sources it cited only gave a possible explanation – hidden damages – for higher payments. They do not establish that such was, in effect, the explanation for the higher payments in the specific cases plaintiffs cited. See, Universal's Opposition to Plaintiffs' ASUMF at ¶ 71. Nevertheless, plaintiffs did not provide a date for the removal of Torres' car, and in the case of Guevara, the record shows the claim accrued by February 2008. See, Plaintiffs' ASUMF at ¶ 71; and Docket No. 144, Exh. 20.

- On April 26, 2005, Recon One was removed from the Network because it was distributing a flyer promising potential clients that it would "economize him or her fifty (50%) of the deductible and depreciation." Universal's SUMF at ¶ 214; Plaintiffs' Opposition SUMF at ¶ 214.

- In March 2006, Río Grande Auto Body was removed from the Network because it made an estimate for parts that were not installed and overstated an estimate so the insured would not have to pay the depreciation insurance deductible (for which the shop eventually had to compensate Universal). Universal's SUMF AT ¶ 235; Plaintiffs' Opposition SUMF at ¶ 235.

- In May 2006, Taller Hojalatería Héctor El Anciano was removed from the Network. Insureds who attempted to use the shop were informed that Universal would not visit the shop or re-inspect vehicles there. Universal's SUMF at ¶ 241; Plaintiffs' Opposition SUMF at ¶ 241.

- In February 2007, Borinquen Body was removed from the Network because the shop had repaired additional damages to a car before notifying Universal, and because an incident where the shop charged for some parts that it did not install.  Universal's SUMF at ¶ 239; Plaintiffs' Opposition SUMF at ¶ 239; Plaintiffs' SUMF at ¶¶ 122–23; Universal's Reply SUMF at ¶¶ 122–23.[32]

- On May 18, 2007, Bumper Royal was removed from the Network because it had repaired parts which, according to Universal's adjustment, needed to be replaced. Universal's SUMF at ¶ 215; Plaintiffs' Opposition SUMF at ¶ 215.

- In June 2007, Body Shop Manufacturing was removed from the Network after Universal received information that it had been charging for original parts that were never installed.  Universal's SUMF at ¶ 232; Plaintiffs' Opposition SUMF at ¶ 232.

- In October 2007, Taller Los Amigos and First Class were removed from the Network for disparaging Universal to its insureds. Universal's SUMF at ¶ 231; Plaintiffs' Opposition SUMF at ¶ 231.

---

[32] The shop was reinstated after the owner visited Universal; asked for another chance; and improved its attitude toward Universal. Universal's SUMF at ¶ 240; Plaintiffs' Opposition SUMF at ¶ 240.

- In 2008, Universal ceased doing business with Mayaguez Auto Body. Universal's employees were ordered to inform insureds that Universal did not conduct commercial relations with that shop. Universal's SUMF at ¶ 237.[33] Universal and Mayaguez Auto Body eventually reached an agreement, and Universal resumed doing business with the shop. Universal's SUMF at ¶ 238; Plaintiffs' Opposition SUMF at ¶ 238.

- Universal removed Garage Pipo from the Network because the shop negligently repaired an insured's car. Universal's SUMF at ¶ 242; Plaintiffs' Opposition SUMF at ¶ 242.

**P. Extreme Body Shop**

Lastly, in 2007 Universal had a controversy with Extreme Body Shop over the proper way to interpret Puerto Rico's sales/service tax. Universal's SUMF at ¶ 217.[34] Ortíz visited Extreme and, afterward, the body shop started collecting the tax according to Universal's instructions. Universal's SUMF at ¶ 218; Plaintiffs' Opposition SUMF at ¶ 218. However, Universal received complaints about negligent or delayed repairs, repairs of vehicles declared total losses, and potentially fraudulent behavior. Universal's SUMF at ¶ 219; Plaintiffs' Opposition SUMF at ¶ 219; Plaintiffs' SUMF at ¶¶ 100-10 (expanding on Universal's problems with Extreme); Universal's Reply SUMF at ¶¶ 100-10 (admitting, in substantial part, plaintiffs' proposed facts regarding Extreme). In at least one instance, Extreme allegedly collected money on a claim when the vehicle had been repaired elsewhere. Universal's SUMF at ¶ 220; Plaintiffs' Opposition SUMF at ¶ 220. There were even possible attempts to bribe Universal adjusters. Universal's SUMF at ¶ 221; Plaintiffs' Opposition SUMF at ¶ 221.

---

[33] Plaintiffs purport to deny this fact on the grounds that Universal did not send letters to its insureds regarding Mayaguez Auto Body. Plaintiffs' Opposition SUMG at ¶ 237. The proposed fact does not state otherwise, and so it is deemed admitted.

[34] Plaintiffs purport to deny this fact, but apart from stating the fact of their denial, the offer nothing in support. Plaintiffs' Opposition SUMF at ¶ 217. The fact is deemed admitted.

Universal decided to remove Extreme from the Network. Universal's SUMF at ¶ 222; Plaintiffs' Opposition SUMF at ¶ 222. Because of this, it also informed insureds that Extreme was no longer a member of the Network, and that for this reason its work would not be guaranteed. Universal's SUMF at ¶ 223; Plaintiffs' Opposition SUMF at ¶ 223.[35] On November 11, 2010, José Díaz of Extreme emailed José Ortíz of Universal to complain about various problems that he was having with Universal, including one of his customer's being told by a Universal employee not to use Extreme, because it was not in the network. Universal's SUMF at ¶ 224; Plaintiffs' Opposition SUMF at ¶ 224. Meanwhile, Extreme's president was attempting regularly to meet with Universal to discuss their differences. Universal's SUMF at ¶ 225; Plaintiffs' Opposition SUMF at ¶ 225. Extreme requested reinstatement, but its request was denied. Universal's SUMF at ¶ 227; Plaintiffs' Opposition SUMF at ¶ 227. Universal ultimately decided to continue dealing with Extreme, for Garage Europa, an important client of Universal, would only honor its warranties if the vehicles were repaired at Extreme. Universal's SUMF at ¶¶ 229-30.[36]

## V.   DISCUSSION

### A.  Section 1981

#### 1.   Timeliness

Universal contends that the Section 1981 claims are time-barred. Earlier in the case, the court examined this issue, concluding that (1) claims for interference with potential contracts have an actionable period of one (1) year; (2) claims for interference with existing contracts are subject

---

[35] Universal did not inform its insureds that it did not maintain commercial relations with Extreme. Plaintiffs' SUMF at ¶ 117; Universal's Reply SUMF at ¶ 117.

[36] Plaintiffs attempted to deny these facts, without any record citations. Plaintiffs' Opposition SUMF at ¶¶ 229-230. Therefore, the facts are deemed admitted.

to a more lenient four-year period; and (3) Universal's decision to inform its clients that it did not maintain commercial relations with Best Auto was not a continuing violation of plaintiffs' rights. See, Dockets Nos. 117 (R&R) and 123 (Order) of Civil No. 09-1649 (DRD).[37]  From that perspective, it denied Universal's request to dismiss the claims on timeliness grounds.  Universal disagrees with the court's ruling, and asks that it be reconsidered.[38]

       i.    Potential Contracts

Universal alleges that claims for interference with potential contracts should be dismissed because Ortiz' decision was made in December 2007, outside the one (1) year actionable period for the claim, and every instance of alleged interference that took place thereafter was the effect of that decision (Docket No. 192).

In the R&R at Docket No. 162, the Magistrate Judge recommended (1) considering Ortiz as the decision-maker, and (2) a finding that Ortiz made the decision on December 3, 2007.  In the Omnibus Opinion and Order the court rejected the Magistrate Judge's recommendation, expressing doubts as to (1) whether Ortiz, alone, made the decision; and (2) when Martínez became aware of it (Docket No. 178).

Examining the issue anew, the court must conclude that Ortiz was the decision maker here, for such is reflected in the record as a whole, including the allegations in the Amended

---

[37] These conclusions will not be revisited.

[38] It raised this issue in its Objections to the R&R, and now again in its Motion for Reconsideration (Dockets Nos. 164 and 192).

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., et al.
Civil No. 11-2160
Opinion and Order
Page 33

Complaint;[39] Martínez' sworn deposition testimony;[40] plaintiffs' responses to Universal's SUMF;[41] and even some of the facts plaintiffs themselves proposed.[42] Along the same line, Ortiz made the decision in December 2007, and notified Martínez personally, via phone.  Consistent

---

[39] In the Amended Complaint, plaintiffs allege that Ortiz was the decision maker behind Universal's discontinuing commercial relations with their shop and the decision to request their "clients" to remove the cars from their shop so they could be repaired elsewhere.  As a matter of fact, she is the only individual defendant in this case.  In the Complaint, Plaintiffs are convinced Ortiz was the sole decision maker and that other employees in Universal, simply followed suit (Docket No. 13 at ¶ 32)(Universal adopted as a policy engineered and spearheaded by Juanita Ortiz to discriminate against the owner of plaintiff Best Auto on account of his race and/or Dominican nationality); see also, Id. at ¶ 39 (Defendant Ortiz' words and actions set the tone and promoted a culture of bias and discrimination against Plaintiff Martínez that continues until this day under her nephew, Joe Ortiz.); Id. at ¶ 60 (virtually the same); Id. at ¶ 38 (Juanita Ortiz "made it her mission to create and promote a culture at Universal of unlawful discrimination against Plaintiffs. . ."); Id. at ¶ 58 ("…Ortiz instructed her subordinates to reject all estimates that came from Best Auto or to drag out the adjustment process as a way of carrying out her pattern of unlawful discriminatory interference against Plaintiffs, or to achieve her purpose of forcing the breach of the contact with Plaintiffs and the removal of the vehicle from Best Auto."); Id. at ¶ 74 ("As the minutes of a June 2007 meeting at Universal led by Ortiz show, Defendant Ortiz reiterated her specific instructions that in every case of a claim where the automobile was taken to Best Auto for repairs, the owner of the car should be told to remove the automobile from Best Auto because Universal would repair the automobile.").  Defendants point to other allegations in the Amended Complaint which the Court cites for reference but eschews for efficiency purposes, in which plaintiffs allege it was Ortiz who decided to interfere with their contracts, and that every action taken by Universal employees stemmed from her instructions in 2007.  Id. at ¶¶ 61, 63, 65-67, 71, 73-75, 77-78, 80, 82-83, 91-94, 96-97, 100-105, 115, 124, 126-128.  Admissions in pleadings are binding on the parties and may support summary judgment against the party making such admissions.  Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc., 976 F.2d 58, 61 (1st Cir. 1992)

[40] See, Docket No. 115, Exh. 2 at pp. 232-234, where Martínez testified as follows:

> **Q.** Do you know—what you know first-hand—who is the person who made the decision at Universal Insurance Company, to do what you call "interference" with these contracts?
> [.        .        .        .]
> **Q.** The person who made the decision, not who told you.
> **A.** I heard it from her.
> [.        .        .        .]
> **Q.** What did you hear from her?
> **A.** Ms. Juanita Ortiz.
> **Q.** What did Juanita Ortiz tell you?
> **A.** She—at a given point, I talked to her and she told me that she was going to take me out of the race [business], that she was not going to allow any car that came to my shop to be repaired, and she closed [sic] the phone.
> [.        .        .        .]
> **Q.** When did that conversation take place?
> **A.** That was in 2007. When the events began—when the events began, that they wanted to take the cars out of my shop, I went over to the company.

[41] See, Plaintiffs' OSUMF at ¶ 178 (where plaintiffs did not oppose that Ortiz issued the instructions, but simply added that her instructions were discriminatory); OSUMF at ¶ 181 (where plaintiffs did not oppose the fact that Ortiz issued the instruction, but simply qualified the instruction); and OSUMF at ¶ 193 (same).

[42] See, Plaintiffs' ASUMF at ¶ 45 (where plaintiffs proposed that Ortiz decided Universal would take Best Auto out of business by interfering with plaintiffs' contracts and potential contracts by informing Universal's insureds they had no commercial relations with the shop); Plaintiffs' ASUMF at ¶ 54 (proposing that Ortiz had complete authority to decide how to deal with Martínez and that from 2004-2010, no supervisor confronted her decision or did anything about it).

with these revised findings, plaintiffs' claims for interference with potential contracts are time barred.

The statute of limitations begins to run when the injured party knew or should have known of the injury and of the likely identity of the tortfeasor. Tokyo Marine and Fire Ins. Co., Ltd. v. Perez & Cia. de Puerto Rico, Inc., 142 F.3d 1, 2 (1st Cir.1998). It is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and uncover any needed information. Rodríguez-Suris v. Montesinos, 123 F.3d 10, 14-17 (1st Cir. 1997); Villarini-García v. Hospital del Maestro, Inc., 8 F.3d 81, 84 (1st Cir. 1993).

Actionable discrimination does not exist in a vacuum. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007). For the same reason, the discriminatory intent of which a plaintiff complains must be traceable to the person "who made the decision." Id. Martínez has known of Ortiz' decision since December 2007.[43] He was so informed by Ortiz herself, via phone.[44] And he admitted that "beginning in 2007, [he] became aware of that Universal had implemented a policy to discriminate against him concerning one or more of the activities mentioned in Section 1981, including [the] right to make and enforce contracts" (Docket No. 13 at ¶ 133). By that time, he also knew of Sánchez Fragoso's racial comments (discussed below).

From these undisputed facts, it is apparent Martínez was aware of the injury and of the identity of the purported injurer, and was in position to pursue a cause of action against it for

---

[43] Plaintiffs' allegations show they believed Ortiz acted alone, and that Universal employees simply followed her lead. Plaintiffs proposed facts and qualifications to Universal's facts also suggest as such. See, Plaintiffs' OSUMF at ¶ 36 (stating that Universal's CEO testified that all decisions within the Claims Department were made by Ortiz and that she had authority to implement whatever she believed); Plaintiffs' ASUMF ¶ 59 (Defendant Ortiz' nephew, Joe Ortiz, has maintained the same structure until the present); Plaintiffs' OSUMF ¶ 49 (qualifying that Brenda Rivera, one of the employees entrusted with dealing with Best Auto, did not question Ortiz' instructions).

[44] See, discussion at note 37.

damages allegedly suffered as a result of the decision of which plaintiffs complain. Yet plaintiffs only did so in July 2009, after the limitations period had expired. By extension, their claim for interference with potential contracts under Section 1981 is time barred and should be dismissed. See, Álamo-Hornedo v. Puig, 745 F.3d 578, 581 (1st Cir. 2014)(noting that discrimination claim should have been brought within a year of plaintiff's knowledge of the purported discriminatory action).

Plaintiffs cannot breathe life into the claim relying on letters that Universal sent to its insureds after July 13, 2008 (a year prior to the date they filed the complaint), because by July 2009 the action had already expired, and those letters were but the effects of the decision they have challenged as discriminatory. See, Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 628-629 (2007)("actions" considered "present effects" of past purported intentional discrimination cannot breathe life into prior uncharged discrimination); Delaware State College v. Ricks, 449 U.S. 250, 258 (1980)("[T]he only alleged discrimination occurred – and the filing limitations periods therefore commenced– at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure – the eventual loss of a teaching position– did not occur until later").

In the Omnibus Opinion and Order, the court read Ledbetter and Ricks to require a different conclusion (Docket No. 178 at pp. 22-24). In Ledbetter, plaintiff claimed the employer gave her a discriminatory performance review, as a result of which she was paid significantly less than her male colleagues. The Supreme Court held the claim untimely, as she filed the corresponding charge after expiration of the 180-day period to do so. Plaintiff countered that each of the paychecks was unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner prior to the EEOC charging period. The Supreme Court disagreed,

essentially relying upon a decision-effect dichotomy to conclude that the checks were the effect of a decision made earlier.  That they were issued during the 180 days prior to filing of the charge did not provide a basis for overcoming the timeliness problem.  Thus, plaintiff should have filed the charge within 180 days after the decision was made and communicated to her.

In the Omnibus Opinion and Order, the court viewed the paychecks in <u>Letbetter</u> as mechanical or ministerial acts (Docket No. 178 at p. 23).[45]  Applying that view, it reasoned that each if the letters that Universal sent to its clients stating it did not do business with Best Auto was as an actionable, discrete act activating a separate limitations period if plaintiffs showed the necessary discriminatory intent.  <u>Id.</u>  As some of those letters may have been sent after July 13, 2008 (e.g. the one-year period preceding the filing of the complaint), they would not pose a timeliness problem.

After further studying the record, a different finding is necessary because those "acts" (the letters) cannot be divorced from their source.  They are inseparably linked to the decision to issue them in the first place.  And that decision was made and communicated to Martínez in 2007.  Consequently, when plaintiffs initiated the action in July 2009, the statute of limitations had already elapsed.  A late claim cannot resurrect an expired action.  <u>See</u>, <u>Ramirez de Arellano</u> v. <u>Alvarez de Choudens</u>, 575 F.2d 315, 320 (1st Cir. 1978)(as the prior action had not tolled the one-year statute of limitations, the subsequent claim was already time barred when it was filed and should have been accordingly dismissed).

The conclusion is more easily grasped if one assumes that no letter was sent after December 2007.  In that scenario, the filing of the complaint nearly one and a half years later could not be

---

[45] The court agreed in this analysis with the R&R at Docket No. 162.

characterized as timely.  But here, letters were sent.  That activity, then, may lead an observer to think at first glance that with each such letter, the statute of limitations began to run anew.  That is how the court originally interpreted those events.  Yet at the end of the day, the letters owe their existence to the decision to which they refer.  As such, they are the direct effect of the decision Ortíz made and communicated to Martínez at the end of 2007, and at bottom, do not lead to a finding of timeliness.  Examination of Ricks confirms this view.

In that case, a college professor was denied tenure.  He initiated a grievance procedure, and was given a final nonrenewable contract.  The grievance was denied; the contract ended; and the employment terminated.  The Supreme Court rejected the claim as time barred, for the statute of limitations began to run when the tenure decision was made and communicated to plaintiff, not at the point where the grievance was denied, or at the point where plaintiff's employment terminated.  Instead, the proper focus on time that the discriminatory act (the unfavorable tenure decision), was made and communicated, not when the effects of that decision occurred.  That was the case even though the defendant was not passive.  Rather, it offered plaintiff a term contract, and denied his grievance.  The operative decision, however, was the one to deny tenure.  What followed were the effects of that decision.

In the same way, the operative decision here was to cease paying for repair jobs in plaintiffs' shop; the effects, the letters and actions implementing the decision.  Like in Ricks, plaintiffs' claim is untimely.  The Omnibus Opinion and Order distinguished Ricks on grounds that triable issues exist (1) with regard to whether Ortíz was the only employee making decisions affecting Best Auto; (2) as to the extent of plaintiff's knowledge regarding Universal's decision to stop engaging in business with Best Auto; and (3) with respect to whether Universal did in fact stop doing business with Best Auto (Docket No. 178 at pp. 26-28).

But as stated above, the decision-maker topic was revisited with the finding that Ortiz was the decision maker.  Her decision was implemented throughout the organization.  In some instances, insureds resisted the decision, which led to conflicting situations between Universal and its insureds.  Faced with that friction, Universal opted to pay for repairs in Best Auto.  Nevertheless, that does not create a genuine issue of material fact as to the identity of the decision maker or as to the date of the critical decision.  Moreover, like the tenure decision in Ricks, Martínez was notified of the critical decision.  He was so notified by Ortiz in the late part of 2007.  And he admitted it so.  At that point, the limitations period started running.  When the complaint was filed in June 2009, the statute of limitations had run on the action for interference with potential contracts.  See, Richardson Const., Inc. v. Clark County School Dist., 223 Fed.Appx. 731, 732-733 (9th Cir. 2007)(dismissing on timeliness grounds discrimination claim based on defendant's refusal to allow plaintiff to bid on any construction project as long as plaintiff was pursuing litigation against defendant; the operative decision was defendant's decision to forbid the bidding; the continued expressions of that decision were the effects of the decision and did not save plaintiff's claims from the running of the statute of limitations); Jersey Heights Asso'n v. Glendening, 174 F.3d 180, 181 (4th Cir. 1999)(defendant's refusal to reconsider decision did not revive the limitations period to claim for the allegedly discriminatory decision to build project near plaintiff's community); Ombe v. Fernández, 914 F.Supp. 782, 788 (D.P.R. 1996)(summary judgment dismissing Section 1981 claim as time barred; in December 1990, defendant informed plaintiff that his contract would not be renewed for next academic year, defendants reiterated their decision on several occasions after the initial notice, and in April 1992, the chancellor informed plaintiff of the appointment's termination; since plaintiff filed complaint in October 1992, the actionable period had expired). See also, Ayala v. Shinseki, 780 F.3d 52, 58 (1st Cir.

2015)(dismissing retaliation action on timeliness grounds; plaintiff may not extend or circumvent the limitations period by requesting modification or reversal of defendant's decision).

      ii.    Existing Contracts

Universal's Motion for Reconsideration argues that plaintiffs should not benefit from the more forgiving four-year statute of limitations applicable to interference with contracts, because they have presented no evidence that any contract was interfered with. Plaintiffs contend otherwise, pointing to two charts listing what in their view were the contracts Universal interfered with, and to other evidence in the record. See, Docket No. 94, Exh. 1.1 (contracts with Universal insureds), and Exh. 1.2 (contracts with third-party claimants).

Rule 1006 of the Federal Rules of Evidence permits the admission of summary charts of "voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. After a careful and thorough analysis of the applicable law, the Magistrate Judge recommended that the charts be stricken (Docket No. 162 at pp. 50-53). The court's Omnibus Opinion and Order adopted the Magistrate's recommendation and struck both charts (Docket No. 178 at pp. 9-10). Nonetheless, it ruled that since the case was proceeding to trial, plaintiffs could still attempt to introduce the charts at trial if they could satisfy the admissibility requirements of Fed. R. Evid. 803(6) and 1006 and redact the "conclusory" language contained therein (Docket No. 178 at p. 11).[46]

Universal urges the court to reconsider that ruling and bar plaintiffs from attempting to introduce the charts, because they never produced during discovery the "underlying materials" allegedly summarized in the charts. See, Docket No. 192 at pp. 17-19; see also, Docket No. 128,

---

[46] That is, language that included conclusory statements about Universal's alleged interference.

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., *et al.*
Civil No. 11-2160
Opinion and Order
Page 40

Exh. 1 at ¶ 82(o); Defendants' Reply Exhs C, D and E.  By plaintiffs' admission, there is no real

voluminous documentation underlying the statements in the charts, as there was only one (1)

written contract which consisted of 1 page (Docket No. 123, Exh. 31).  Given that plaintiffs alleged

that most contracts (all but one) were verbal, defendants requested plaintiffs during discovery to

provide a list of all individuals plaintiffs allegedly contracted with; whether the contract was with

Martínez or Best Auto as a corporation; the date of the contract; the terms of the contract; if

plaintiffs relied on an estimate as a contract, the exact copy of the estimate plaintiffs relied on; and

Universal's alleged interference, among other information relevant to plaintiffs' allegations. See,

Docket No. 128, Exh. 1, Reply to Plaintiffs' OSUMF ¶ 82(o), Docket No. 129, Exh. C at p. 2;

Opposition to Plaintiffs' ASUMF ¶ 62.

 In opposing Universal's motion, plaintiffs have referred to the charts again.  However, they

did not provide the information requested, suggesting instead that they had no duty to produce the

information, and that Universal should look for itself in its own records to decipher this

information.  See, Docket No. 129, Exh. D at p. 3 (". . .the requested information of the contracts

can be derived from the files Universal has;" plaintiffs have "no obligation under the Federal Rules

of Civil Procedure to prepare 'lists'" (Id. at p. 3); and ". . .the clients on the list attached to the

Amended Complaint entered into a verbal contract with Mr. Martínez and/or Best Auto" (Id. at p.

2).  Neither Martínez' deposition nor his declaration convey the contract-related information

provided by way of the charts.

 Fed. R. Evid. 1006 does not permit the introduction of charts to summarize testimony, and

for that reason, the court will not discuss the chart's contents in determining whether plaintiffs'

contracts were interfered with.  See, U.S. v. Appolon, 695 F.3d 44, 61 (1st Cir. 2012)(Rule 1006's

purpose is to permit summary of voluminous documents, as opposed to testimony); U.S. v. Irvin,

682 F.3d 1254, 1262 (10th Cir. 2012)(proponent of a Rule 1006 chart bears the burden of showing that the rule's requirements are met); Maradiaga v. Intermodal Bridge Transport, Inc., 899 F.Supp.2d 551, 570 (N.D. Tex. 2012)(striking chart because it was unclear whether proponent had ". . .made available to plaintiffs for inspection and copying all the documents that underly [sic] the summaries"); Biomet, Inc. v. Fields, 2008 WL 5191496, *5 (N.D. Ind. Dec. 9, 2008)(same).

Without this information, it is not feasible to determine if the charts refer to enforceable contracts as plaintiffs posit, or if their client simply received an estimate from plaintiffs without agreeing to repair the car for a mutually agreeable price, or regardless of the adjustment process contemplated by Universal's policies.   Plaintiffs, however, presented evidence of incidents experienced by plaintiffs' clients at Universal, which they have characterized as interference with contracts:

- In 2008, Rosa Lázaro-San Miguel took her car to be inspected by Universal. On June 4, 2008, she received a letter from Marisol Lugo, a Universal adjuster, stating that Universal did not have commercial relations with plaintiffs' shop. The record is devoid of any facts about what happened thereafter or what employees were involved in the claim adjustment process after the letter. There is a letter on record suggesting that Universal paid the claim two (2) days later, without indication as to where the car was repaired. Plaintiffs' ASUMF at ¶ 90(a)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 90(a)(1). Plaintiffs' ASMF at ¶ 90(a)(1); and Docket No. 103, Exh. 32.

- Sometime in July 2008, Wilfredo Valentín took his car to Martínez' shop for repairs, as he had done in the past. Plaintiffs' ASUMF at ¶ 64(a)(1)-(2).[47] Pursuant to Ortiz' orders, Valentín went to Universal's Guaynabo office, where he waited for a prolonged time, and was questioned by an unnamed employee about Martínez' estimate. Id. at ¶ 64(a)(2).

---

[47] Although plaintiffs' refer to Martínez' shop as Best Auto, the uncontested evidence shows that Best Auto was not incorporated until February 20, 2009. See, Universal's Reply to Plaintiffs' OSUMF No. 71. Hence, all reference to Best Auto before such date is inaccurate.  The Court will instead refer to Martínez' shop.

According to plaintiffs, Valentín was referred to this office on Ortiz' instructions. Valentín was told to take his vehicle to Borinquen Body instead of Martínez' shop. He testified that no one would tell him what the problem was with Martínez. Id. When Valentín insisted that his car be repaired by Martínez, an unnamed Universal employee got angry and ordered him to wait in the lobby. Id. ¶ 64(a)(3). Eventually, Universal paid Valentín's claim, but only after further arguing over Martínez and the estimate for his repairs. Id. at ¶¶ 64(a)(4)-(6); see also, Universal's SUMF at ¶ 83; Plaintiffs' OSUMF at ¶ 83. Valentín has since continued having his car repaired by Martínez. Universal's SUMF at ¶ 84; Plaintiffs' OSUMF at ¶ 84. Valentín did not provide the name of the employees involved in the process.

- In or around March and August 2009, José Martino, also an attorney, was told by Universal not to repair his car at Best Auto. After haggling with Enrique Polanco, plaintiffs performed the repair. Plaintiffs' ASUMF at ¶ 90(a)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 90(a)(1).

- In 2010, José Maldonado-Rodríguez took his car to Best Auto for repair. Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(1). In order to file the corresponding accident claim, Maldonado went to Universal's Guaynabo office, where Maryann Santos Bonilla (who according to Maldonado, was very cordial) assisted him and told him that Best Auto could not repair his car. He was told that he could take his car to any other repair shop, except for Best Auto. Plaintiffs' ASUMF at ¶ 64(b)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(2). He was offered no explanation as to why he could not have his car repaired at Best Auto, but was provided with a list of alternative shops. Plaintiffs' ASUMF at ¶ 64(b)(3); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(3). Eventually, Maldonado pointed out to Olga de La Rosa (a Universal supervisor) that Universal was violating his insurance policy; Universal then inspected Maldonado's vehicle and paid his claim. Plaintiffs' ASUMF at ¶ 64(b)(6); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(b)(6).

- In 2010, Joaquin Monserrate-Matienzo went to Best Auto to have his vehicle repaired. However, on December 21, 2010, the car was towed from Best Auto's premises and taken

to be repaired at Borinquen Body. Plaintiffs' ASUMF at ¶ 73; Universal's Opposition to Plaintiffs' ASUMF at ¶ 73.

- Sometime after 2010, Juan Trinidad-Martínez filed a claim on his wife's car. According to him, Universal adjuster Enrique Jimenez-Grau told him he had to bring an estimate from a shop on a list he provided or else his claim would not be resolved. Plaintiffs' ASUMF at ¶ 64(d)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(d)(2). Trinidad then enlisted the help of his insurance broker. Plaintiffs' SUMF at ¶ 64(d)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(d)(2). After speaking with a Universal supervisor and haggling over estimates, Universal eventually agreed to pay the claim. His vehicle was repaired at Best Auto. Plaintiffs' ASUMF at ¶ 64(d)(3)-(4); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(d)(3)-(4). On two subsequent occasions, Universal initially denied Trinidad's demand to have his vehicle repaired at Best Auto, though both times Universal backed down, agreeing to pay for the repairs. Plaintiffs' ASUMF at ¶ 63(d)(5); Universal's Opposition to Plaintiffs' ASUMF at ¶ 63(d)(5).[48]

- In or around March 2012, Ramón Rivera-Silva was initially told that Universal did not "do business with that man, Elvis [Martínez]." When Rivera persisted, Universal allowed the repair to be done by Best Auto. Plaintiffs' ASUMF at ¶ 90(a)(2); Universal's Opposition to Plaintiffs' ASUMF at ¶ 90(a)(2).

- In two other occasions Universal agreed to pay more for claims if the insureds agreed not to have their cars repaired at Best Auto. First, Pedro Torres had his car removed from Best Auto and taken to Borinquen Body, which was paid more than the amount in plaintiffs' estimate. Plaintiffs' ASUMF at ¶ 71; see also, Docket No. 126, Exh. 3 at p. 94 ("I did not repair [Torres's car]. [Universal] took it out of my shop and brought it to Borinquen Body, and they paid a greater amount for it over there . . . ."). In a second case, Jose Guevara-Casellas had his car removed from Best Auto and moved to Borinquen Body after Universal agreed not to apply depreciation. Plaintiffs' ASUMF at ¶ 71; see also, Docket

---

[48] Trinidad testified he perceived some kind of discrimination; however, when asked why he believed this, he did not offer any facts except for perception. Also, he admitted he never received any reasons from Universal as to why he could not take his car to Best Auto. See, Docket No. 101, Exh. 24 at pp. 16-20.

No. 144, Exh. 20 at p. 1 ("In this case, it was agreed not to apply depreciation costs, because the insured agreed that the car could be removed from [Best Auto]").[49]

Universal contends that these instances involved preliminary arrangements contingent upon Universal's ultimate inspection; a determination of whether the car could be repaired; and how much it would pay for the repair.  In that sense, it argues that plaintiffs have not established the existence of a contract with which Universal interfered, since all they did was show they had hopes of materializing a contract with a client if Universal allowed the repair to go ahead in accordance with the insurance policy.

From that perspective, policy holders could not have entered into contracts with plaintiffs without regards to Universal's ultimate determination if they Universal to pay for plaintiffs' job.  Both the insured and Martínez had to wait for Universal's inspection prior to repairing the car. If the car was a total loss, Martínez was not supposed to repair it.   In consequence, a critical contractual element – fulfillment of a condition precedent to the contract's existence – would be lacking had they authorized plaintiffs to repair a vehicle prior to awaiting Universal's determination.

A condition precedent defines an event which must occur before a contract is in place. Sands v. Ridefilm Corp., 212 F.3d 657, 661-662 (1st Cir. 2000).  If the condition is not fulfilled, the contract does not exist, and the obligations attached to the condition may not be enforced.  Id. In consequence, plaintiffs' purported contracts with their clients may have been preliminary (not

---

[49] Universal attempted to deny the facts contained in this paragraph, but the sources it cited only gave a possible explanation – hidden damages – for higher payments.  They do not establish that such was, in effect, the explanation for the higher payments in the specific cases cited by plaintiffs.  See, Universal's Opposition to Plaintiffs' ASUMF at ¶ 71.  That said, plaintiffs did not provide a date for the removal of Torres' car, and in the case of Guevara, the record shows the claim accrued by February 2008.  See, Plaintiffs' ASUMF at ¶ 71; and Docket No. 144, Exh. 20.  Therefore, the court will disregard both claims as time-barred.

final) arrangements contingent upon a condition precedent - completion of Universal's inspection and adjustment process – for the contract to materialize.[50]

Yet even if the contracts between Martínez and the policy holders were subject to a condition precedent, it would seem that the condition was satisfied when the adjustments process finalized, leading to payment. That would be the case with Trinidad, Lázaro, Martino and Rivera-Silva.  But vehicle-repair contracts carry different components such as payment rate; type of materials (i.e. new or otherwise); transportation of vehicle to and from the repair shop; timeframe for the job; and payment terms.  And the record contains no details about the agreements that Martínez or Best Auto entered into (Report and Recommendation at p. 87).  On that basis, Universal's purported interference with plaintiffs' preliminary arrangements would fall under the category of interference with the ability to enter into contracts, which, as previously discussed, is time barred.

There is evidence in the record stemming from plaintiffs' deposition and/or plaintiffs' witnesses suggesting that two (2) clients characterized their dealings with plaintiffs' shop as a contractual relationship: Carmen Pimentel, and Iraida Cardona.  According to Carmen Pimentel, in 2006 she entered into a contract with Martínez to repair her car.[51] Plaintiffs' ASUMF at ¶ 35.  But when she filed a claim with Universal, an unidentified adjuster gave her a list of Network shops.[52]  In 2007, Pimentel again had Martínez fix her vehicle.  Universal did not pay because the

---

[50] For the same reason, plaintiffs had to wait for Universal to decide (1) whether the car was repairable; (2) what it would pay for the repair; and (3) how much it would pay.

[51] Pimentel's statement does not provide the details of the alleged contract; but she characterized her dealings with Martínez as such.

[52] Pimentel testified that this unidentified person told her to take her car away from Best Auto because it would be better for her, as Universal did not do business with it.  Universal asked the court to exclude this statement because it is hearsay.  Because Pimentel did not identify this person, the court cannot assess whether the statement qualifies as one of the hearsay exceptions.  Universal's Opposition to Plaintiffs' ASUMF at ¶ 35.

car was a total loss. In 2008, she sued Universal for denial of this last claim.  In 2010 she settled the case. Id.; see also, Docket No. 99, Exh. 16.  As to the 2006 interaction, there is no evidence on what happened after she was given a list of Network shops.  She did not testify on whether she removed the car from plaintiffs' shop.  And in 2007, the car was total loss, a legitimate ground not to pay for repairs under the policy.

In the case of Iraida Cardona, in 2009 she had her car brought to Best Auto for repairs.[53] Plaintiffs' ASUMF at ¶ 64(c)(1); Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(c)(1).  Eliu Gómez, a Universal employee, told her to take her car to Borinquen Body because Best Auto could not repair her car. Plaintiffs' ASUMF at ¶ 64(c)(2).[54]  After arguing further with Universal, Cardona retained an attorney. Id. at ¶ 64(c)(3).  Cardona paid for the repairs herself; her insurance claim was never resolved, and she ultimately filed a complaint with the OIC (which closed the case). Id. at ¶ 64(c)(4).  It is not clear what the terms of the contracts were.[55]  In these circumstances, the record does not support a contract interference claim.

## 2.  Scope of Coverage

In context, the factual setting upon which plaintiffs reply lies beyond the scope of Section 1981.  Section 1981 protects the right to make and enforce contracts.  It offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial

---

[53] The contents of the alleged agreement are not on the record.

[54] Universal attempted to deny the alleged statements of Universal's adjustor to Cardona, arguing that they amounted to inadmissible hearsay.  See, e.g. Universal's Opposition to Plaintiffs' ASUMF at ¶ 64(c)(2)-(4).  For present purposes, the court will consider the assertion as a party-opponent statement under. Fed. R. Evid. 801(d)(2)(E).

[55] Plaintiffs produced a document (Contract) with Miguelina Tejeda. The document provides that Martínez would not commence the repair until Universal had concluded the inspection of the case and decided on the amount of parts to be replaced and the estimated total cost of repair (Docket No. 123-20, Exh. 31). Nowhere in the contract do the parties agree that Ms. Tejeda would have paid Martínez a given price regardless of Universal's adjustment process.  The clause constitutes a condition precedent, making the arrangement one of pre-contractual character subject to the one-year limitations period discussed earlier.

discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship. Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 479 (2006).  The scope of its coverage has changed over time.  See, Hammond v. Kmart Corporation, 733 F.3d 360, 362 (1st Cir. 2013)(so noting).

In Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the Supreme Court held that Section 1981 did not apply to post-formation conduct.  Id. at 177 ("[T]he right to make contracts does not extend … to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions").  In 1991, Congress amended the statute, redesignating the original text as Section 1981(a), and adding subsections (b) and (c).  Subsection (b), effectively reversed Patterson, providing that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[56]

At bottom, even with this broader definition, Congress's focus on barring all racial discrimination in contracts did not change.  Hammond, 733 F.3d at 363 (emphasis in original)(citing H.R. Rep. No. 102-40 p. 2 at 731).  As a result, courts interpreting Section 1981 require a sufficient nexus between the asserted discrimination and a contractual right or relationship.  Id. (quoting Garrett v. Tandy Corp., 295 F.3d 94, 98 (1st Cir. 2002).  The alleged discrimination must interfere with the "make and enforce" contractual interests described in the statute.  Id.  Otherwise, Section 1981 would become a catch-all remedy to racial discrimination,

---

[56]  In turn, Subsection (c) states that Section 1981 applies to discrimination by nongovernmental as well as governmental actors.

producing satellite litigation of immense scope contrary to congressional intent.  Id.  (quoting

Domino's Pizza, Inc., 546 U.S. at 479).

With this backdrop, the facts here show two (2) basic configurations:  (1) plaintiffs'

relationship with individuals who had purchased insurance policies from Universal; and (2)

Universal's relationship with its insureds.  How Section 1981 applies to them may be examined

through caselaw focusing on the interaction of three (3) different parties as a function of the

arrangements reflecting similar two-tiered dynamics.

In Daniels v. Pipefitters' Ass'n Local Union No. 597, 945 F.2d 906 (7th Cir. 1991), the

defendant operated a job referral service pursuant to a collective bargaining agreement.  The

service was the primary mechanism through which contractors hired union employees to the point

where, in essence, no referral meant no job, and no opportunity for union members to enter into

employment contracts with employers.  The court held that Local 597 had actively obstructed

plaintiff, an African American union member, from obtaining employment at a construction job

while giving out referrals to white union members.

In Vakharia v. Swedish Covenant Hosp., 765 F.Supp. 461 (N.D. Ill. 1991), plaintiff, an

African American anesthesiologist, alleged that the defendant hospital interfered with her ability

to contract with patients.  The hospital maintained a system where anesthesiologists' sole

mechanism to obtain patients was through assignment by the hospital and referrals by staff

surgeons.  The hospital removed plaintiff from a "first call" schedule, allegedly classified her as a

junior anesthesiologist (which confined her to a limited number of relatively simple types of

procedures), and suspended her privileges.  The court held that the hospital prevented and impeded

the formation of contracts between plaintiff and prospective patients.

In Morrison v. American Bd. of Psychiatry & Neurology, Inc., 908 F.Supp. 582 (N.D.Ill. 1996), plaintiff, an African American, sued the Board alleging that it discriminated against her on racial grounds by denying her certification in psychiatry.  She stated that certification is a large, if not the primary factor which patients consider and many hospitals require in choosing or hiring a physician.  On that basis, she stated that because of the Board's conduct, she would not be considered for employment in large hospitals and HMO's requiring psychiatrists to be board certified; and her expertise would be called into question from future employers and potential patients.  The court agreed, noting that many medical facilities and private patients made Board certification a prerequisite to employment.

Finally, in Harris v. Allstate Ins. Co., 300 F.3d 1183 (10th Cir. 2002), plaintiff, an African American, owned SPI, a business that repaired smoke, fire, and water damage to property. Defendant Allstate was an insurer who had a program for referring its insureds to approved vendors for repair services. When one of Allstate's insureds needed an emergency repair service, Allstate would allow the insured to choose from a list of vendors who provided the service.  According to SPI, the insured rarely had a preference.  In that circumstance, Allstate would choose the vendor. SPI was on Allstate's list, but received a disproportionately low number of the referrals.  The court rejected the Section 1981 claim, pointing out that being on the referral list was not a necessary requirement for the plaintiff to enter into contracts with Allstate's insured.  Together, these cases provide a valuable framework to assess plaintiffs' claim, focusing on the extent to which Universal withheld an element critical for a contract to be formed.

In Daniels, the union's job referral service was a necessary intermediary and conduit connecting job opportunities to job referrals. In Vakharia, the hospital maintained a system where anesthesiologists' sole mechanism to obtain patients was through assignment by the hospital and

referrals by staff surgeons.  In Morrison, the Board controlled certification, without which plaintiff was deprived of professional contracts.  By contrast, in Harris, being on a referral list was not necessary for the plaintiff to enter into contracts with Allstate's insured.  And the same may be said of plaintiffs' relationship with clients or potential clients who additionally had a contractual relationship with Universal.

With that in mind, there is no contract between plaintiffs and Universal, or allegations that Universal prevented plaintiffs from entering into any such contract with it.  In fact, plaintiffs had no interest in becoming members of Universal's Network.  Martínez even attempted to boycott the Network.  Nor is there evidence that Universal was under a contractual obligation to refer insureds to plaintiffs.

Universal has been sued for not financing Universal's clients' choice of Best Auto to repair cars.  But no one prevented anybody – including Universal's insureds – from entering into a contract with plaintiffs and paying for plaintiffs' services if they wished to do so, under whatever terms they agreed to.  It was a choice open to those interested in having plaintiffs perform repair work for them.  That is why, like in Harris, it cannot be concluded that Universal blocked plaintiffs from contracting with individuals willing to pay for their services, or demanded anybody to refrain from paying for those services out of their own pocket after they were performed.

Plaintiffs contend Universal informed its insureds that it had no commercial relations with Best Auto, and on that basis, argue that Universal unlawfully interfered with contractual or potentially contractual relationships (Docket No. 13 at p. 20, Section B).  For all that, the policy holder was at liberty to pay for the repair instead of demanding that Universal pay for it.  In the Omnibus Opinion and Order, the court held that plaintiffs could seek redress under Section 1981 because Universal did not immediately agreed to pay.  Refocusing on the issue, that holding must

be taken back.  Plaintiffs' clients were at liberty to contract with them without Universal's paying

for anything.  In that regard, plaintiffs cannot point to a prohibited interference with their right to

"make and enforce contracts" under Section 1981.

　　　3.  Evidentiary Framework

　　　In the event the arrangements here could be viewed and interpreted through different lens,

they would not support a finding of liability.  Section 1981 borrows Title VII's case law.  Bhatti

v. Trustees of Boston University, 659 F.3d 64, 70 (1st Cir. 2011); Conward v. Cambridge School

Committee, 171 F.3d 12, 18-19 (1st Cir. 1999).  Plaintiffs may show discrimination through direct

evidence of discrimination or, absent such evidence, through the McDonnell/Douglas burden-

shifting framework.  Ayala-Gerena v. Bristol Myers Squibb, 95 F.3d 86, 95 (1st Cir. 1996);

Balderston v. Fairbanks Morse Engine Div. of Coltec Industries, 328 F.3d 309, 321 (7th Cir. 2003).

　　　Direct evidence is the kind of smoking gun evidence that the court rarely encounters; it is

"evidence which, in and of itself, shows a discriminatory animus."  Ayala-Gerena, 95 F.3d at 95.

That evidence is absent here.  Plaintiffs, then, have to show prohibited discrimination through the

burden-shifting framework developed to assess claims in these circumstances.   Under such

framework, they must first establish a *prima facie* case of discrimination. The "contours of a *prima*

*facie* case are flexible and situation-specific", Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 719

(1st Cir. 1994), yet usually involve at least requiring the plaintiff to show that he belongs to a

protected class; that he suffered an adverse action; and that there is a causal connection between

the two elements.  St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

　　　If the plaintiff satisfies this initial prong, the burden shifts to the defendant to articulate a

legitimate reason for the adverse action.  If the defendant meets this burden, the initial presumption

created by the *prima facie* case is dispelled and plaintiff must "prove by a preponderance of the

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a

pretext for discrimination." Hicks, 509 U.S. 515.

i.    *Prima Facie* case

Initially, Universal questioned whether plaintiffs established a *prima facie* case, arguing

they failed to establish that they belonged to a protected class (i.e. Best Auto was co-owned by a

white person); and that they suffered an adverse action. After the Magistrate Judge issued the R&R,

however, Universal did not re-raise those arguments.  So the court will eschew this discussion and

will assume for purposes of this Opinion that both plaintiffs (Martínez and Best Auto) have made

out a *prima facie* case of prohibited discrimination.

ii.    Proffered Reasons for its Decision

In the Omnibus Opinion and Order, the court agreed with the Magistrate Judge in that

Universal's proffered reasons for its decision were legitimate (Docket No. 178 at p. 39).[57] As

described above, the parties' relationship deteriorated over the years because of Martínez'

aggressive behavior toward Universal's employees; Martínez' defiance of Universal's

determinations during the adjustment process, which created conflicts with the insured; Martínez'

challenges to Universal's "total loss" determinations, which caused Universal at times to have to

pay for repairs that were not warranted; Martínez' instigation to clients to file claims against

Universal; and ultimately, Martínez' frontal attack to Universal's business strategies, such as the

Network and the discount policy.

These are valid, nondiscriminatory reasons for the decision challenged here.  See, Pina v.

Children's Place, 740 F.3d 785, 797-798 (1st Cir. 2014)(disparaging remarks recognized as

---

[57] "[T]he court agrees with the Magistrate Judge that Universal satisfied its burden of production by positing several legitimate, non-discriminatory reasons for its refusal to engage in business relations with Best Auto since 2007."

legitimate, nondiscriminatory grounds for plaintiff's termination); Palmer v. Albertson's LLC, 418 Fed.Appx. 885, 888 (7th Cir. 2011)(uncooperative attitude considered legitimate, nondiscriminatory reason for plaintiff's termination); Adams v. Tennessee Dept. of Finance, 179 Fed.Appx. 266, 274 (6th Cir. 2006)(combative and obnoxious attitude deemed legitimate, nondiscriminatory reason for the defendant to take adverse action against plaintiff); Corbin v. Southland Intern., 25 F.3d 1545, 1550 (11th Cir. 1994)(uncooperative attitude regarding defendant's new group production system held legitimate, nondiscriminatory reason for plaintiff's termination); Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989)(insubordinate attitude and difficulty in working with defendant's employees held legitimate, nondiscriminatory reason for plaintiff's termination); Baiju v. U.S. Dept. of Labor, 2014 WL 349295, *13 (E.D. N.Y. January 31, 2014)(inability to take direction and confrontational behavior recognized as legitimate, nondiscriminatory reasons for plaintiff's termination); López-Cruz v. FPV & Gaíndez, PSC, 922 F.Supp.2d 225 (D.P.R. 2013)(divisive attitude toward new managerial configuration threatened business enterprise, constituting legitimate, nondiscriminatory reason for plaintiff's termination); Caspersen v. Monarch Broadcasting, 2008 WL 2166948, *1 (W.D. Okl. May 22, 2008)(plaintiff's refusal to do what he was directed to do considered legitimate, nondiscriminatory reason for plaintiff's termination); Williams v. Anheuser-Busch, 957 F.Supp. 1246, 1250 (M.D. Fla. 1997)(making disparaging, potentially damaging remarks about defendant's products held legitimate, nondiscriminatory justification for termination); Marlow v. Office of Court Administration, 820 F.Supp. 753, 758 (S.D.N.Y. 1993)(belligerent attitude considered legitimate, nondiscriminatory reason for adverse action taken against plaintiff).

iii.     Pretext

Pretext analysis is more demanding than the assessment of whether a *prima facie* case has been established.  Mariani-Colón, 511 F.3d at 222.  It moves the inquiry to a new level of specificity.  Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).  It is not enough for a plaintiff merely to impugn the veracity of the defendant's justification for its decision.  Meléndez v. Autogermana, Inc., 622 F.3d 46, 52 (1st Cir. 2010); Morgan v. Massachusetts General Hosp., 901 F.2d 186, 191 (1st Cir. 1990); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Plaintiff must produce evidence that the defendant did more than get it wrong. Johnson v. Weld County, Colo., 594 F.3d 1202, 1211 (10th Cir. 2010).  He must elucidate specific facts which would enable a jury to find that the reason given for the defendant's action is a sham intended to cover up the defendant's real motive: plaintiff's race.  Collazo-Rosado, 765 F.3d at 92 (1st Cir. 2014); Meléndez, 622 F.3d at 52; Mesnick, 950 F.2d at 824.

In the Omnibus Opinion and Order, the court adopted the Magistrate Judge's reasoning that several pieces of evidence could be used to infer pretext, including (1) remarks made by some of Universal's employees about Martínez' race; (2) a 2004 letter and email; (3) more favorable treatment received by other shops who also appeared not to be in Universal's good graces; and (4) absence of an investigation by Universal regarding a complaint that Martínez made against a Universal adjuster (Docket No. 178 at pp. 40-45).  Revisiting the issue, the court is persuaded that those elements do not measure up to established liability standards.

a. Comments

First, according to Martínez, in June 2007 he visited Universal's regional office in Carolina, Puerto Rico, with a client called Wendy Ventura.  While waiting in the reception, Martínez heard the receptionist tell David Sánchez-Fragoso (an adjuster) that a client of Martínez

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., et al.
Civil No. 11-2160
Opinion and Order
Page 55

was calling on the phone.  Martínez and Ventura saw Sánchez-Fragoso shake his head in an

apparent gesture of disapproval.  At that moment, based on Martínez' account, Sánchez- Fragoso

said: "Elvis, that black Dominican?  We took him out of the Network and we will take him out of

business."  Plaintiffs' ASUMF at ¶ 63; Plaintiffs' Exh. 3, Martínez' Deposition at p. 205, l. 1-7.[58]

Martínez requested a meeting at Universal to complain about Sánchez-Fragoso's remarks,

and met with supervisors Nelson Medina and José Baralt. Plaintiffs' ASUMF at ¶ 37; Universal's

Reply SUMF at ¶¶ 37-38.  Universal did not, however, investigate Martínez' complaints.  No one

interviewed Sánchez-Fragoso about the incident. Plaintiffs' ASUMF at ¶ 39.  But it is uncontested

Ortíz was never apprised of Sánchez-Fragoso's statements or of Martínez' complaint.  Plaintiffs'

ASUMF at ¶ 40; Universal's Reply SUMF at ¶ 40.  Without that knowledge, she cannot be charged

with leading or engaging in a tainted decision-making process.

Second, around December 2007 Sánchez-Fragoso told David Alemán-Pacheco, one of

Universal's client, that Universal would not allow his car to be repaired by "that Dominican."

Plaintiffs' ASUMF at ¶ 45A; Plaintiffs' OSUMF at ¶ 198.  After hearing the statement, Alemán

told Sánchez-Fragoso that Martínez' nationality had nothing to do with his ability to repair

Alemán's car. Alemán later returned with a friend, and Sánchez-Fragoso insisted that his car would

not be fixed by the "Dominican." Plaintiffs' ASUMF at ¶ 46.  Sánchez-Fragoso did not report to

Ortiz; has never interacted with her; and has never participated in Claims Department's monthly

---

[58] Plaintiffs stress the use of the word "we" in Sánchez-Fragoso's statement and invite the court to create an inference from such word to spill over to Ortiz.  But the word *we* cannot be stretched to create an inference that he meant Ortiz, the decision maker, or that she somehow shared a discriminatory animus with him, absent any other evidence to link her to the statement itself.  As discussed in the text, such evidence does not exist.  Ortiz never interacted with him, never consulted nor discussed her decision with him, he never participated in the Claims Department Monthly meetings and did not report to Ortiz. Universal's SUMF at ¶ 96).

meetings with her.  Universal's SUMF at ¶ 96; Plaintiffs' OSUMF at ¶ 96.[59] His purported prejudice cannot be attributed to her.

Third, Juan Sánchez-Huertas, a former Universal adjuster, heard xenophobic comments from several Universal employees.  More on point, he testified that the Claims Department held regular meetings with management, where his supervisors participated.  During those meetings, supervisors would gather instructions, which they passed along to the adjusters, who did not participate in the meetings.

Sánchez-Huertas said that he, and other adjusters, received instructions from supervisors to tell insureds not to take their cars to Best Auto. He was informed that those instructions came from Ortiz; and that he often heard some supervisors (Morales, Medina, Baralt, and Yumet refer to Martínez as "that Dominican" or "that Dominican garage" (Docket No. 142, Exh. 12 at p. 50). The comments were made around 2007, and lasted until at least January 2008, when he left Universal.

Sánchez-Huertas could not connect any of those disparaging statements with Ortiz. Plaintiffs' ASUMF ¶¶ 26, 51, 52; Universal's Reply to Plaintiffs' ASUMF ¶¶ 26, 51 and 52.[60] There is no evidence that they originated with Ortiz; that they were made in Ortiz' presence; that Ortiz was informed of them; or that she approved or adopted them.  Inferring that she agreed with those statements or condoned them is too far a reach to be permissible here.  See, Bennett v. Saint-

---

[59] Plaintiffs denied this fact because they understood the decision went beyond simply not to hold commercial relations with the shop, but to inform Best Auto's clients of this (Plaintiffs' OSUMF at ¶ 96). Plaintiffs did not, however, offer evidence to discredit Universal's facts about the lack of interaction between Sánchez-Fragoso and Ortiz.

[60] Plaintiffs' proposed statements at ASUMF ¶¶ 76-77, about what clients Thelma Rodríguez, Pedro Torres and Ana García allegedly heard from Universal employees are excluded because they are premised on inadmissible double hearsay (Martínez states that these clients told him that Universal employees told them to remove their cars from the shop of that Dominican). See, Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005)(excluding as inadmissible hearsay plaintiff's testimony that a co-worker told her that another co-worker had said a harassing comment).

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., et al.
Civil No. 11-2160
Opinion and Order
Page 57

Gobain Corp., 507 F.3d 23, 29 (1st Cir. 2007)(since discriminatory remarks were allegedly made by a person other than the decision-maker who had no part in the adverse employment decision, his comments, even if made, would constitute nothing more than stray remarks; as such, "they would be insufficient to block summary judgment"); Zukowski v. St. Lukes Home Care Program, 326 F.3d 278, 281 (1st Cir. 2003)(stray remarks removed from the adverse action and completely divorced from the decision maker and the decision-making process cannot be used to draw an inference of discrimination).

Along the same line, there is no evidence that the employees who allegedly harbored a discriminatory animus (Sánchez-Fragoso, Morales, Nelson Medina, Baralt, and/or Yumet), informed Ortiz of the problems upon which she decided to sever Universal's business relationship with plaintiffs, so as to contaminate or influence her decision with racial discrimination.  On the contrary, the uncontested facts show that Ortiz took into consideration (1) complaints presented by at least four (4) different adjusters (Ryan, Molina, Villegas, and Fonseca), on plaintiffs' refusal to accept total loss determinations; (2) letters sent by owners of external shops regarding Martínez' leadership role behind the boycott to the discount policy and the Network; (3) information received directly from employees within the OIC about plaintiffs' instigation of clients to file complaints against Universal; and (4) an email forwarded by Mr. Luis Díaz regarding Martínez' participation in the boycott against the discount policy.  None of these instances were referred to Ortiz by employees who made the stray remarks plaintiffs have relied on.

For that reason, the remarks cannot be used to support plaintiffs' claim.  The biases of one who neither makes nor influences the challenged personnel decision are not probative of discrimination. See, Bonefont-Igaravidez v. International Shipping Corp., 659 F.3d 120, 125-126 (1st Cir. 2011)(excluding comments made by non-decision makers from pretext analysis because

there was no evidence that the decision maker knew of these comments, or that in making her decision, she relied on information from any employee who may have harbored discriminatory animus); Ayala-Gerena, 95 F.3d at 97 (noting lack of probative value of racial remarks made by non-decision makers in concluding that "[a]ppellants have failed to show what [the court] consider[s] to be the necessary link between the speakers' statements and the decision to terminate appellants' employment"); Hicks v. Johnson, 755 F.3d 738, 747 (1st Cir. 2014)(in an attempt to show pretext with evidence of discriminatory animus, plaintiff cited a statement attributed to her former supervisor, describing plaintiff as an "angry black woman"; however, her former supervisor took no part in the promotion decision, consequently, such evidence does nothing to establish a genuine issue of material fact as to whether the promotion decision was motivated by anything other than the other applicant's documented scoring edge in the interviews).[61]

   b. E-mail

   In October 2004, Ortiz sent Martínez a letter warning him not to interfere with Universal's claim adjustment process. She then forwarded the letter to a supervisor, stating the letter was the beginning of a documentation to get rid of Best Auto through legal means. Ortiz indicated that she had purportedly made the letter pretty, and that the recipient would enjoy it.

   Given the sarcasm, Ortiz' words may be considered inappropriate. But the email (particularly the word "legally") is not probative of discrimination. See, Mesnick, 950 F.2d at 828 (evidence that defendant may have been glad to relieve itself of plaintiff's bad behavior does not

---

[61] See also, Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998)(motivations or remarks of those who lack hiring and firing authority over the plaintiff cannot form the basis for a discrimination claim); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990)(the biases of one who neither makes nor influences the challenged personnel decision are not probative of discrimination); Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1097 (6th Cir. 1996)(concluding that a comment made in an outside consultant's report that a candidate was "American born, American trained" did not show discriminatory animus because there was no evidence that the decision maker adopted the comment in the hiring process).

translate into evidence of prohibited animus for purposes of discrimination claim). More important, there is no contemporaneity to support a reasonable inference of discriminatory animus here, for the comment was made three (3) years before Ortiz finally decided that Universal would not pay for repairs at Best Auto because of her perception of Martínez' behavior. The facts closely resemble a case solved in this District, where the court held that a comment made by the decision maker years before termination of plaintiff's employment (i.e. that he disliked plaintiffs' beliefs, and that his suspension was simply the beginning of a documentation to get rid of him), was considered insufficient to prove that his termination was moved by religious discrimination. See, Cortez-Hernández v. Centennial P.R., 2010 WL 4690878 (D.P.R. November 18, 2010). The court sees no reason to hold differently here. Thus, even looking at the email in light most favorable to plaintiffs, well settled First Circuit case law prevents the court from inferring some kind of discriminatory animus from Ortiz. See, González, 304 F.3d at 70 (remote and ambiguous remarks against older people –i.e. plaintiff had old ways -"manias de vieja"- not sufficient to establish pretext).

c. Disparate treatment

At another level, there has been no showing that Universal treated comparable individuals or organizations outside of their protected class more favorably. The core of a discrimination action is the assertion that the defendant treated plaintiff less favorably than others on account of protected characteristics. In line with this principle, a plaintiff may point toward the treatment received by those other entities as evidence of pretext. Windross v. Barton Protective Services, 586 F.3d 98, 103-104 (1st Cir. 2009); Kosereis, 331 F.3d at 214.

For the test to be workable, the comparators must have been similarly situated to plaintiff in all relevant respects. Rathbun v. Autozone, Inc., 361 F.3d 68, 76 (1st Cir. 2004); Benoit v.

Technical Manufacturing Corporation, 331 F.3d 166, 174 (1st Cir. 2003); Rivas-Rosado v. Radio Sack, Inc., 312 F.3d 532, 535 (1st Cir. 2002); Lowery v. Hazelwood, 244 F.3d 654, 660-661 (8th Cir. 2001); Mitchell v. Toledo, 964 F. 2d 577, 583 (6th Cir. 1992); Mariani-Colón, 511 F.3d at 221-222.  To support a finding of discriminatory motive, it must show unexplained differences in the treatment of similarly-situated individuals.  Woodward v. Emulex Corp., 714 F.3d 632, 639 (1st Cir. 2013).

Plaintiffs have made no such showing.  Even though they assert that Universal treated them more harshly than other shops, the record does not support their view.  For those shops to be considered similarly situated, plaintiffs had the burden to produce evidence that: (1) the shops engaged in conduct similar to Best Auto's during a similar length in time; (2) that Universal gave them similar opportunities throughout many years, which they also did not take advantage of; and (3) that contrary to Best Auto, Universal did not sever ties with them, despite the shops' continued misconduct. But there is no evidence that with respect to other shops: (1) Universal faced similar scenarios as those faced with Best Auto over the course of many years; (2) that Universal took increasing measures against them; and (3) that despite the shops' continued misconduct, it did not decide to sever ties with the shop.  To the contrary, the information on record demonstrates that, if anything, Universal was far more patient with Best Auto.

At the onset, Martínez was disrespectful of Universal's employees; constantly challenged Universal's adjustments; refused to abide by Universal's total loss determinations; was repeatedly advised that total losses were Universal's exclusive right and that he should stop interfering with this determination; was verbally warned on various occasions by Universal's top executives to stop acting as a public adjustor and challenging Universal's adjustments (there are corroborated incidents on the record as to constant challenges to, and interference with, Universal's adjustors);

incited Universal's policy holders to file claims with the OIC; assisted the insured in presenting and/or defending such claims; had a leading role in developing a strategy to dismantle Universal's discount policy and the Network; Universal received letters from various shops that accused Best Auto of deceiving them and leading a personal vendetta against Universal; among others). See, Universal's SUMF ¶¶ 113-161, 169-172, 176-179, 182-190, 192, 200, 204-209.

As for the other shops:

- In 2003, Taller Tomás Serrano was removed from the Network because it had overstated estimates. Universal's SUMF at ¶ 236; Plaintiffs' Opposition SUMF at ¶ 236.

- In 2004, Universal Auto Collision was removed from the Network after Universal received a complaint against it involving some defects in repairs, charging for original parts and, apparently, installing stolen parts. Plaintiffs' ASUMF ¶¶131-132; Universal's Reply to Plaintiffs' ASUMF ¶¶131-132 (Docket No. 128-2); and Docket No. 115-25 (Translation of Universal's Exhibit 1.25). Universal's SUMF at ¶ 233; Plaintiffs' Opposition SUMF at ¶ 233. Universal Auto requested reinstatement, but the request was denied. Universal's SUMF at ¶ 234; Plaintiffs' Opposition SUMF at ¶ 234. There is no evidence of additional incidents following Universal's decision to remove the shop from the Network so as to warrant harsher measures.

- In 2005, Recon One was removed from the Network because it was distributing a flyer promising potential clients that it would "economize him or her fifty (50%) of the deductible and depreciation." Universal's SUMF at ¶ 214; Plaintiffs' Opposition SUMF at ¶ 214.

- In March 2006, Río Grande Auto Body was removed from the Network because it had made estimates for parts that were not installed and overstated an estimate (for which the shop eventually had to compensate Universal). Universal's SUMF at ¶ 235; Plaintiffs' Opposition SUMF at ¶ 235; Plaintiffs' ASUMF ¶¶129-130; Universal's Reply to Plaintiffs' ASUMF ¶¶129-130 (Docket No. 128-2); and Docket No. 115-27 (Translation of Universal's Exhibit 1.27). There is no evidence on record to suggest

there were other incidents after Universal decided to remove it from the Network in 2006 so as to warrant harsher measures.

• In February 2007, Borinquen Body was removed from the Network because the shop had repaired additional damages to a car before notifying Universal, and because an incident where the shop charged for some parts which it did not install.  Universal's SUMF at ¶ 239; Plaintiffs' Opposition SUMF at ¶ 239; Plaintiffs' SUMF at ¶¶ 122–23; Universal's Reply SUMF at ¶¶ 122–23. [62]

• On May 18, 2007, Bumper Royal was removed from the Network because it charged the client for a new part the shop repaired, when according to Universal's adjustment, the part needed to be replaced. Universal's SUMF at ¶ 215; Plaintiffs' Opposition SUMF at ¶ 215.

• In June 2007, Body Shop Manufacturing was removed from the Network after Universal received information that it had charged for original parts that were not installed.  Universal's SUMF at ¶ 232; Plaintiffs' Opposition SUMF at ¶ 232.  The record also shows that BSM had some participation in the boycott to Universal's discount policy. Universal's SUMF ¶ 171 (Docket No. 71-1) Plaintiffs' Opposition to Universal's SUMF ¶ 171 (Docket No. 94). However, aside from the incident mentioned above and BSM's participation in the boycott, there is no other evidence supporting the same myriad of problems that Universal faced with Best Auto, that spanned over a similar period, as discussed above.

• In October 2007, Taller Los Amigos and First Class were removed from the Network for disparaging Universal to its insureds. Universal's SUMF at ¶ 231; Plaintiffs' Opposition SUMF at ¶ 231.

• In 2008, Universal ceased doing business with Mayaguez Auto Body, and Universal's employees were ordered to inform insureds that Universal did not conduct commercial relations with that shop. Universal's SUMF at ¶ 237.[63]  Universal and Mayaguez Auto

---

[62] The shop was reinstated after the owner visited Universal; asked for another chance; and improved its attitude toward Universal. Universal's SUMF at ¶ 240; Plaintiffs' Opposition SUMF at ¶ 240.

[63] Plaintiffs purport to deny this fact on the grounds that Universal did not send letters to its insureds regarding Mayaguez Auto Body.  Plaintiffs' Opposition SUMG at ¶ 237.  However, the proposed fact does not state otherwise, and so it is deemed admitted.

Body eventually reached an agreement, and Universal resumed doing business with the shop. Universal's SUMF at ¶ 238; Plaintiffs' Opposition SUMF at ¶ 238.

• Universal removed Garage Pipo from the Network because the shop negligently repaired an insured's car. Universal's SUMF at ¶ 242; Plaintiffs' Opposition SUMF at ¶ 242.[64]

• Universal removed Extreme from the Network after complaints regarding negligent or delayed repairs; repair of cars that were total loss or convinced the clients their cars could be repaired; allegedly collected the money from a claim when the car was repaired in another shop; and in 2009 an employee attempted to offer a present to one of Universal's employee, which the employee rejected. See, Universal's SUMF ¶217-¶221 (Docket No. 71-1). Universal informed insureds that Extreme was no longer part of the Network and, therefore, that it could not guarantee their job. See, Universal's SUMF ¶222-223 (Docket No. 71-1).  In 2010, it denied a request to reinstate Extreme, but agreed to reestablish commercial relations with it.

There is no occasion for a finding that Universal treated plaintiffs more harshly than other similarly situated shops, for those shops did not carry the set of problems that led Universal to make the decision being challenged here.  Three of the shops, however, merit special focus: Mayaguez Auto Body Shop; Borinquen Body Shop; and Extreme Auto.

First, in 2007 Universal removed Borinquen from the Network because it was not complying with the terms of the Network contract. Universal's SUMF ¶ 239 (Docket No. 71-1). In that case, Universal faced: problems in the negotiation process with the shop; "angry disputes" over repairs; a dispute over the application of the sales/use tax; the shop's interest in a raise of its labor rate; the shop's repairing some additional damages to a car before notifying the insurance company, and apparently charging for some parts that it did not install.  The owner of the shop

---

[64] In May 2006, Taller Hojalatería Héctor El Anciano was removed from the Network.  Insureds who attempted to use the shop were informed that Universal would not visit the shop or re-inspect vehicles there. Universal's SUMF at ¶ 241; Plaintiffs' Opposition SUMF at ¶ 241. The record is unclear as to why the shop was removed from the network.

asked for an opportunity; sat with management to discuss their differences; and improved his attitude toward Universal. Thus, the shop was reinstated in the Network. See, Universal's SUMF ¶ 240 (Docket No. 71-1); Plaintiffs' ASUMF ¶¶ 118; Universal's Reply to Plaintiffs' ASUMF ¶¶ 118 (Docket No. 128-2).

Martínez testified that Borinquen Body's owner participated in creating the Committee to oppose Universal's discount policy. Yet there is no evidence that Ortiz came to know this until Martínez' deposition. To the contrary, the letter on record where Ortiz is informed of Martínez's leading role on the boycott does not mention Borinquen Body at all. See, Universal's SUMF at ¶ 171. Plaintiffs have proffered no evidence showing that Universal faced issues with Mayaguez Auto Body that were similar in nature to those it faced with Best Auto, over a similar period of time, and that Universal decided not take harsher measures against the shop despite of this. There is no evidence that Borinquen Body continued presenting problems subsequent to being removed from the Network or after its reinstatement.

Second, in 2008, Ortiz decided that Universal would not conduct inspections within the premises of Mayaguez Auto Body, and instructed employees to inform clients that Universal did not conduct commercial relations with the shop. See, Universal's SUMF ¶ 237 (Docket No. 71-1); Plaintiffs' Opposition to Universal's SUMF ¶ 237 (Docket No. 94); and Universal's Reply ¶ 237 (Docket No. 128-1). After she gave the instruction not to deal with the shop, Mayaguez Auto Body's owner met with Universal's supervisors and they reached agreeable arrangements. Thus, Universal continued doing business with the shop. Universal's SUMF ¶ 238 (Docket No. 71-1); Plaintiffs' Opposition to Universal's SUMF ¶ 238 (Docket No. 94). Plaintiffs have proffered no evidence showing that Universal faced issues with Mayaguez Auto Body that were similar in

nature to those it faced with Best Auto, over a similar period of time, and that Universal decided

not take harsher measures against the shop despite of this.

Third, as to Extreme, in 2007 Universal had a controversy with the shop over the proper

way to interpret Puerto Rico's sales/service tax.  Universal's SUMF at ¶ 217.[65]  Ortíz visited

Extreme and, afterward, the body shop started collecting the tax according to Universal's

instructions.  Universal's SUMF at ¶ 218; Plaintiffs' Opposition SUMF at ¶ 218.  Universal

received complaints about negligent or delayed repairs, repairs of vehicles declared total losses,

and potentially fraudulent behavior. Universal's SUMF at ¶ 219; Plaintiffs' Opposition SUMF at

¶ 219; Plaintiffs' SUMF at ¶¶ 100-10 (expanding on Universal's problems with Extreme);

Universal's Reply SUMF at ¶¶ 100-10 (admitting, in substantial part, plaintiffs' proposed facts

regarding Extreme).   In at least one instance, Extreme allegedly collected money on a claim when

the vehicle had been repaired elsewhere. Universal's SUMF at ¶ 220; Plaintiffs' Opposition SUMF

at ¶ 220.  There were even possible attempts to bribe Universal adjusters. Universal's SUMF at ¶

221; Plaintiffs' Opposition SUMF at ¶ 221.

Universal decided to remove Extreme from the Network, Universal's SUMF at ¶ 222;

Plaintiffs' Opposition SUMF at ¶ 222;  and informed insureds that Extreme was no longer a

member of the Network, and that Extreme's work would not be guaranteed.  Universal's SUMF

at ¶ 223; Plaintiffs' Opposition SUMF at ¶ 223.[66]  On November 11, 2010, José Díaz of Extreme

emailed José Ortíz of Universal to complain about various problems that he was having with

---

[65] Plaintiffs purport to deny this fact, but apart from stating the fact of their denial, the offer nothing in support.  Plaintiffs'
Opposition SUMF at ¶ 217.  The fact is deemed admitted.

[66] Universal did not inform its insureds that it did not maintain commercial relations with Extreme.  Plaintiffs' SUMF at ¶ 117;
Universal's Reply SUMF at ¶ 117.

Best Auto Repair Shop, Inc. v. Universal Insurance Group, Inc., *et al.*
Civil No. 11-2160
Opinion and Order
Page 66

Universal, including one of his customer's being told by a Universal employee not to use Extreme, because it was not in the Network. Universal's SUMF at ¶ 224; Plaintiffs' Opposition SUMF at ¶ 224. Meanwhile, Extreme's president was attempting regularly to meet with Universal to discuss their differences. Universal's SUMF at ¶ 225; Plaintiffs' Opposition SUMF at ¶ 225. Extreme requested reinstatement, but its request was denied. Universal's SUMF at ¶ 227; Plaintiffs' Opposition SUMF at ¶ 227. Ultimately, Universal decided to continue dealing with Extreme, because Garage Europa, an important client of Universal, would only honor its warranties if the vehicles were repaired at Extreme. Universal's SUMF at ¶¶ 229-30.[67] Garage Europa is a seller of expensive cars, such as Audi, Land Rover, and Porsche. Because the insurance premium is affected by the insured car's cost, the premiums generated by cars sold by Garage Europa were substantially higher than those associated to less expensive cars. Had Universal decided to sever commercial relations with Extreme, altogether, its relationship with Garage Europa would have been affected, as well as its business' income. See, Universal's SUMF ¶¶ 228-230; Plaintiffs' Opposition to Universal's SUMF ¶¶ 228-230 (in which plaintiffs' failed to provide record citation to contest Universal's facts; see also Docket No. 128-1 at ¶¶ 228-230).[68]

After Universal removed Extreme from the Network, Extreme's conduct was nothing like Best Auto's. Extreme sat down with Universal and tried to solve the issue and turn the page. Best Auto, instead, chose to generate additional controversies by fostering claims against Universal in the OIC which were eventually dismissed. And there is no evidence on the record that Ortiz ever received letters accusing Extreme's owner of leading a personal campaign against Universal or

---

[67] Plaintiffs attempted to deny these facts, without any record citations. Plaintiffs' Opposition SUMF at ¶¶ 229-230. Therefore, the facts are deemed admitted.

[68] Plaintiffs attempted to deny these facts, but provided no record citation. Thus, the court rejects their denial.

deceiving them into withdrawing from the Network; or information that he instigated clients to file claims against Universal with the OIC.   Thus, Universal's treatment of the two cannot reasonably be used to infer racial discrimination. Extreme and Best Auto are not "fair congeners." See, Conward, 171 F.3d at 20 ("cases must be fair congeners[;] . . . apples should be compared with apples"); Jackson v. Norman, 264 Fed.Appx. 17, 20 (1st Cir. 2008)(". . . [T]he record does not support a finding that there was the requisite degree of similarity between [plaintiff's] circumstances and those of the other . . . instructors to whom he seeks to compare himself"); Woodward, 714 F.3d at 640 (". . .Woodward occupied a unique position within Emulex, as the only employee working from a remote office… This arrangement likely entailed specific administrative costs.  Given this context, the fact that other employees experienced declines in revenue similar to Woodward's falls far short of the showing necessary to establish that they were similarly situated to him for purposes of the pretext inquiry");  Pina, 740 F.3d at 798 (no pretext due to absence of evidence that defendant treated other employees similarly situated in a different manner); Conward, 171 F.3d at p. 16 ("No valid comparison can be drawn between two incidents for the purpose of proving disparate treatment if 'differentiating or mitigating circumstances' distinguish either the employee's conduct or the employer's response to it").

Plaintiffs argue that the harsher treatment they received suggests that Universal was racially motivated.  But the incidents related by plaintiffs in their SUMF, as well as those gathered from Universal's own facts, do not make any of the other shops closely resemble the plaintiffs'. In the end, there is no evidence establishing that Universal faced with those shops similar scenarios

as those faced with Best Auto over the course of many years.  To the contrary, if anything, Universal was far more patient with Best Auto.[69]

  d. Absence of Investigation

Plaintiffs point to a letter sent by Martínez to Medina of Universal in June 2007 complaining about Sánchez-Fragoso's comments regarding Martínez' race, and to the fact that no investigation was conducted.  Plaintiffs' ASUMF at ¶ 38.  They argue that the lack of investigation suggests discrimination.  It is undisputed that Martínez' letter was never forwarded to Ortiz. Plaintiffs' ASUMF at ¶¶ 39-40.  But in its Omnibus Opinion and Order the court had agreed with plaintiffs in that letter could be used, together with the other factors discussed above, to infer pretext.

Universal's Motion for Reconsideration asks the court to reconsider because there is no case law establishing a company's duty to investigate complaints sent by third parties; much less creating an inference of discrimination absent an investigation under similar circumstances.  It argues that the only relevant case law allows for an affirmative defense in the employment context, when the employer has a policy against discrimination in place, and the employee unreasonably fails to take advantage of the policy. See, Faragher v. Boca Raton, 524 U.S. 775 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). That is, an investigation may be used to establish an affirmative defense; however, an absence of investigation cannot be used in the offensive to infer or demonstrate discrimination, especially if the company has no duty to investigate, under its policies, or under the law.

---

[69]  The court recognizes, as plaintiffs propose, that Universal has not issued letters, such as the ones complained of by plaintiffs, to any other shop. Plaintiffs' OSUMF at ¶ 216.  In the end, plaintiffs are not similarly situated to anybody else.

Be that as it may, the fact that Ortiz, the only decision maker in this case, knew nothing about Martínez' complaint or about Sánchez-Fragoso's statements, takes probative valve out of this event.  Ortiz could not have condoned the alleged discrimination if she knew nothing about it. The court, then, reconsiders the Omnibus Opinion and Order and concludes that the record is devoid of sufficient evidence from which a reasonable jury could infer that Universal's proffered reasons for its decision are simply a sham for discrimination.  To the contrary, the clashes between Universal and Martínez; the timeline of events; the gradual increment in measures involving Best Auto; and the contemporaneity of Universal's harsher measures in 2007 with Martínez' attacks to the Discount Policy and the Network, show that Universal's decision was business-related, and that racial discrimination took no part in it. That being so, plaintiffs' Section 1981 claims must be DISMISSED.

## B.  Puerto Rico Law

### 1.  Tortious Interference with Contracts

Plaintiffs allege that Universal's actions amount to a tortious interference with their contracts under Article 1802 of the Puerto Rico Civil Code.  The Magistrate Judge recommended dismissing this cause of action (Docket No. 162).  In the Omnibus Opinion and Order, the court rejected her suggestion because federal claims survived summary judgment.  That is no longer the case.

A party alleging tortious interference with a contract must prove: (1) existence of a contract between two or more parties; (2) interference with that contract by the defendant; (3) fault on the defendant's part; (4) damage to the plaintiff; and (5) a nexus between the plaintiffs' damage and the defendant's fault. New Comm Wireless Services, Inc. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); R.R. Isla Verde Hotel Corp. v. Howard Johnson Intern., Inc., 121 Fed.Appx. 870, 871 (1st

Cir. 2005).  The action is subject to the one-year statute of limitations set in Article 1868 of the

Puerto Rico Civil Code.

To survive summary judgment, plaintiffs must submit admissible evidence of enforceable

contracts.  But, as discussed above, they did not do so.  See,  Burckhart Search Group, Inc. v. Doral

Financial Corp., 2011 WL 6029817, *7-*8 (D.P.R. November 30, 2011)(dismissing contract-

interference claim in part for lack of sufficient details to infer that a contract existed); Ramallo

Bros. Printing, Inc. v. El Día, Inc., 392 F.Supp.2d 118, 143 (D.P.R. 2005)(other than assertion that

shopper printing is handled mainly on a contract basis, plaintiff offered no evidence showing a

contract interfered with);  R.R. Isla Verde Corp., 121 Fed.Appx. at 871 (assertion that a contract

existed for development of a hotel using defendant's flag insufficient to demonstrate existence of

contract).

Assuming, *arguendo,* that they did, the only evidence of a contract are the cases of Carmen

Pimentel and Iraida Cardona. Plaintiffs' ASUMF at ¶¶ 35 and 64(c)(1)-(4); Universal's Opposition

to Plaintiffs' ASUMF at ¶¶ 35 and 64(c)(1)-(4).  Pimentel's claim with Universal was filed in

2006. Considering that the complaint was filed in July 2009, it is clearly outside the one-year

statute of limitations for a tortious interference claim.  And the same goes for Ms. Tejeda's

contract, which was signed in October 2007. E.g., Ms. Tejeda's contract at Docket No. 123, Exh.

31.  So the cause of action is unavailable to the plaintiffs in this factual scenario.  In these

circumstances, the claim for interference with contracts under Puerto Rico law must be

DISMISSED.

2.  Negligence

The Amended Complaint asserts that Universal was negligent (Docket No. 13 at p. 56,

Section VIII).  It states the action stems from letters sent to Best Auto's clients informing them

that Universal did not maintain commercial relationship with the shop.  And also, that Universal allegedly spread malicious lies about the shop, such as that Universal's employees told Best Auto's clients that the shop used to install stolen parts.

Universal argues that plaintiffs' negligence action is really a defamation claim (Docket No. 78).  Plaintiffs' Opposition does not address the issue, and thus, the Magistrate Judge deemed it uncontested (Docket Nos. 78 and 162).  Under Puerto Rico law, a plaintiff alleging defamation must prove that a defendant made false statements about plaintiff, and that these statements caused damages.  Ayala-Gerena, 95 F.3d at 98.  The action is subject to the one-year statute of limitations of Article 1868 of the Puerto Rico Civil Code.  Ojeda-Ojeda v. El Vocero, 137 D.P.R. 315, 326 (1994).  Plaintiffs' claim that Universal used to tell clients that they installed stolen parts dates back to 2001, and, thus, is time barred.

As to the assertion in Universal's letter to clients that Universal did not have commercial relations with Best Auto, it cannot be said – let alone proved – that it was false.  To the contrary, it is the very foundation of plaintiffs' Section 1981 claim.  Falsity of the statement, an element of the defamation claim, is absent here. Because a defamation claim may not survive on these grounds, it must be DISMISSED.

## VI.    CONCLUSION

For the reasons stated above, plaintiffs' Motion for Reconsideration is DENIED, defendants' Motion for Reconsideration is GRANTED, and the case is DISMISSED.

Judgment shall be entered accordingly.

<u>Best Auto Repair Shop, Inc.</u> v. <u>Universal Insurance Group, Inc.,</u> *et al.*
Civil No. 11-2160
Opinion and Order
Page 72

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2016.

<u>s/Pedro A. Delgado-Hernández</u>
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge